[Crim. No. 58.  Third Appellate District.—February 15, 1908.]

## THE PEOPLE, Respondent, v. FRANK KELLEY, Appellant.

CRIMINAL LAW—MURDER—DEFENSE OF INSANITY—EVIDENCE—PREJUDICIAL INSTRUCTION—MURDER IN FIRST DEGREE—ABSENCE OF QUALIFICATION.—Upon the trial of a defendant charged with murder, where the sole defense was insanity at the time of the homicide, rendering him without volition or responsibility, and powerless to know or appreciate the wrongfulness or criminality of his act, and there was evidence strongly tending to sustain such defense, an instruction to the effect if defendant was insane he could not be found guilty of murder in the first degree, because incapable of forming that willful, deliberate and premeditated malice aforethought which constitutes such crime, standing alone, without any other qualification in the charge as to the law of insanity as a defense to crime, is· highly prejudicial, and is ground for reversal of a judgment of conviction of murder in the second degree.

ID.—INSANITY ESTABLISHED ENTITLES TO ACQUITTAL.—Where insanity is established as a defense to a charge for crime, it entitles the defendant, under the law, to an absolute acquittal.

APPEAL from a judgment of the Superior Court of Lassen County, and from an order denying a new trial. F. A. Kelley, Judge.

The facts are stated in the opinion of the court.

Pardee & Pardee, for Appellant.

U. S. Webb, Attorney General, and J. Chas. Jones, for Respondent.

HART, J.—The defendant, under an information charging him with the crime of murder, was convicted at the trial of murder of the second degree.

From the judgment and the order denying him a new trial he takes this appeal.

The homicide occurred on the twenty-second day of January, 1907, in the county jail at Susanville, the defendant having been arrested and confined in said jail on that day upon

suspicion that he was insane. The sheriff, who made the arrest, employed the deceased, Perry Stout, to remain with and guard the defendant during the night of the day of the arrest. At about the hour of 12 o'clock that night one Packard, a night watchman and deputy sheriff, went to the jail with food or "supper" for Stout and the prisoner. On reaching the inside of the jail he found Stout lying dead on the floor. Death, it was learned upon investigation by the sheriff, who had been summoned to the jail immediately upon the discovery of Stout's death, and by the autopsy physician, who later examined the body, was caused by knife wounds.

The defendant, as stated, had been arrested on the supposition that he was insane. He had been engaged as a laborer on tunnel work for the Western Pacific Railway, and was placed under arrest by the sheriff at a point on the line of said railway known as "Camp No. One." The evidence discloses that the defendant had been on a protracted "spree," or under a state of alcoholic intoxication for a number of days previous to his arrest, and that his actions prior to and at the time of his said arrest were so unusual and queer that it was generally believed by his acquaintances that he had lost his reason. The sheriff was notified of the conduct of the defendant and was requested to place him in custody, and, in obedience to said request, arrested and confined him in the county jail, as already related.

The defendant did not deny killing Stout, but interposed the defense that, at the time of the commission of the homicide, he was insane.

On the fourth day of February the district attorney was about to proceed with the arraignment of the defendant upon the information filed against him, when, upon a suggestion by counsel representing the accused, the court, by the authority of section 1368 of the Penal Code, made an order, reciting that a doubt existed as to the sanity of the prisoner, and that the question of his sanity be submitted to a jury. Thereupon a jury was summoned and impaneled to try the question of defendant's mental condition. The jury, after hearing evidence, returned a verdict "that said alleged insane person is at the present time insane." Upon this verdict, the judge of the superior court made an order committing the accused to the Napa state hospital for the insane.

The effect of this verdict and order of commitment to the state hospital was only, of course, to suspend, until such time as the prisoner might recover, further proceedings involving his arraignment and trial.

On the eighteenth day of March, 1907, the medical superintendent of the state hospital officially declared the recovery of the defendant, and accordingly made an order, in compliance with section 2189 of the Political Code, discharging him from said hospital.

The defendant was subsequently returned to the custody of the sheriff of Lassen county, and on the eighteenth day of July put upon his trial for the crime of murder, as charged against him in the information.

The defendant, on this appeal, makes the complaint that the trial court erred to his prejudice in a number of its rulings upon questions of evidence, and likewise erred in giving and refusing certain instructions. It is also urged that certain jurors, impaneled to try the case, received evidence bearing upon the issues of the case out of court. But it will not be necessary to notice all the assignments of error, for we are in no doubt that a reversal of the cause is imperatively demanded because of prejudicial error involved in the charge of the court to the jury.

The only defense interposed to the charge was, as we have seen, that the defendant was, at the time he killed the deceased, insane to the extent that he was without volition or responsibility—that is, that he was so unbalanced mentally that he was powerless to know and appreciate the wrongfulness or criminality of his act.

The circumstances attending the homicide, according to the description given by the witnesses of the wounds inflicted upon the body of the deceased, were of unusual atrocity and wickedness, if the act was committed by the defendant in a state of sanity. There were found upon the body of the deceased by the autopsy physician something like thirty wounds, all of which, with the exception of one, were produced by a knife. A few of the wounds were inflicted, in the opinion of the physician, after the deceased had expired. One of the wounds—that on the right side of the neck—extended over an inch to the left of the median line to two

inches and a half beyond the right ear, severing the jugular vein and carotid artery.

There is evidence tending to show that the defendant, for some days prior to the homicide, had been indulging in alcoholic drinks to such an extent that he became a victim of delirium tremens; that, as before suggested, his actions were so far from his ordinary and apparently normal manner of conducting himself that those who had some personal acquaintance with him became convinced that his mind was affected to the extent at least of temporary dethronement of reason. Expert testimony was offered by both sides as to the mental sanity of the defendant at the time of the commission of the act of killing. As is usual in almost all cases in which insanity is relied upon as a defense to crime, the testimony of the alienists was conflicting—those for the defense claiming that the defendant was certainly insane at the time, and those testifying for the prosecution declaring with equal positiveness that, while he was laboring under certain hallucinations, superinduced by long-continued alcoholic intoxication, he nevertheless had intelligence enough to know that his act was not only wrongful but criminal. The defendant and the deceased had never met before the evening preceding the morning on which Stout was found to have been slain, and no motive or reason for the homicide is shown by the record. The defendant made no effort to escape, and there was some evidence to the effect that the opportunity was readily available to him to do so had such a thought been in his mind. In short, the evidence was such that the jury would have been warranted in returning a verdict either for or against the accused.

If the defendant was, at the time he killed Stout, insane to a degree that he was incapable of knowing and understanding that he was thus doing wrong, then he was entitled, under the law, to an absolute acquittal. Logically, under the evidence as presented in the case at bar, either one of two verdicts only could properly have been returned—the one, that the defendant was guilty of murder of the first degree; the other, an acquittal altogether of any offense embraced in the charge in the information. By this we are not to be understood as saying that a verdict of guilty of murder of the second degree or of manslaughter could or should not be sustained,

if the instructions and rulings of the court did not involve prejudicial error. We only make the suggestion for the purpose of illustrating the proposition that the defendant was entitled to a full and accurate statement by the court to the jury of the law applicable to the sole defense interposed by him against the charge alleged in the information. The court signally failed to so instruct the jury, as must be readily obvious from an examination of its full charge, and particularly from the following instruction read and submitted to the jury as the law upon the question of insanity as a defense to the charge of murder: "If you believe and find from the evidence that the defendant was, at the time of the alleged killing, insane from any cause, either of a temporary or settled nature, then you should *not find the defendant guilty of murder in the first degree, for if insane he could not form that willful, deliberate, premeditated and malice aforethought intent* which the law absolutely requires to constitute murder in the first degree." The objection made to the quoted instruction is that the court thereby in effect declared to the jury that they could find the defendant guilty of any crime included within that charged in the information other than murder of the first degree, even though they believed the defendant was insane to the extent of irresponsibility at the time he killed the deceased. The instruction, while stating the law correctly as far as it goes, is, we think it will not be disputed, open to the criticism involved in the complaint urged against it. If the court had elsewhere in its charge stated the law fully and correctly upon this subject to the jury, then there might be room for the application of the argument advanced that the charge, considered in its entirety or as a whole, fairly presented the law relating to the defendant's only defense, and although, even under the mentioned circumstances, the instruction would be none the less vulnerable to the criticism made against it, there would perhaps be some ground for holding that it did not operate prejudicially to the accused. But we have searched the record in vain for a single line in any of the court's instructions bearing upon the issue of insanity in which the jury were told that, if the defendant was shown by sufficient proof to have been insane at the time of the commission of the act, he was thereby under our law absolved from responsibility for

the same, and, consequently, entitled to an absolute acquittal, or a verdict of not guilty of any offense comprehended in the charge preferred against him. The criticised instruction, standing alone and without any other or further or more correct amplification of the law applicable to insanity as a defense to the crime of murder cannot reasonably be construed to mean anything less than that, if the defendant were shown to have been insane when he killed Stout, he would thereby be entitled to an acquittal of murder of the first degree because his mentality was such that he could not conceive and form the malice aforethought essential to a consummation of the crime of murder of that degree, but that as to the other degree of murder or manslaughter insanity would not excuse him. This is not the law as it should have been declared to the jury, and the instruction was highly prejudicial.

The judgment and order are reversed and the cause remanded.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the ·supreme court,. after judgment in the district court of appeal, was denied by. the supreme court on April 16, 1908.