[Crim. No. 1545. Second Appellate District, Division One.—November 21, 1927.]

THE PEOPLE, Respondent, v. LOUIS SCHULER, Appellant.

70

 

Wm. T. Kendrick, Jr., and Chas. W. Ostrom, for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

McLUCAS, J., *pro tem.*—The defendant was convicted of murder in the second degree and appeals from the judgment and from an order denying his motion for a new trial.

It appears that the defendant was employed as a gardener by Harrison Chandler and had been so employed for several years. The deceased, Godfrey Repensek, had also been employed by Chandler as a chauffeur for a little more than one year prior to his death. On March 3, 1925, when Chandler was approaching his home, about seventy-five yards from the garage he heard two shots which he thought was the exhaust from his automobile, as he knew the chauffeur was working on the car in the garage. After the lapse of about one minute, he heard a third shot, and then went into the house. Ten or fifteen minutes later the maid informed him that something had happened to the chauffeur; whereupon he went to the garage and found Repensek lying underneath the automobile. After the shots were heard, Chandler saw the defendant proceed to the yard, where he worked on the lawn until the police officers arrived. Chandler testified that, so far as he knew, the defendant and the deceased were good friends, and that during all the time Schuler was working for him he never had any trouble; that he had never known Schuler to have a gun in his possession; that he was not of a quarrelsome disposition; but that the witness "had noticed a little while

before this happened that he was grouchy, a little grouchier than usual." F. F. Stevens, sergeant of police, testified that upon arriving at the Chandler residence he pulled the dead body of Repensek from underneath the automobile and found two bullet holes in his head, and located the defendant pushing a wheelbarrow; that he asked the defendant if he shot Repensek, which the defendant denied. The sergeant saw a large lump on the defendant's head, "half as big as a hen's egg," and a small round hole in his head with a slight stream of blood coming from it. He asked the defendant if he had shot himself, to which the defendant replied that he had not; but when asked, "How came that hole in there?" replied, "I shot." He asked him where the gun was and, being told that it was up over the garage, proceeded to the garage, during which time the defendant stated that he had shot Repensek; that defendant said, "He is no good, I have trouble with him." The officer went upstairs in the garage and found the gun under the bedclothes, "which was all full of blood." On cross-examination the witness testified that the defendant Schuler was not in the best of mental condition at the time the witness talked with him; that the defendant kept saying he was suspicious of the man he shot; that defendant "had the attitude of an enraged bull—just a wild, sullen bull"; and that defendant did not talk coherently. A statement was taken from defendant at the time of his arrest, in which he stated that he shot Repensek; that Repensek tried to get the defendant to go downtown with him the evening before the shooting, but that defendant refused to go; that nothing led up to the shooting, but that defendant was suspicious of Repensek; that "I thought he might meet a gang; I got suspicious that he wanted to lure me downtown to get me beat up, or something like that." When inquiry was made as to what aroused defendant's suspicions, he replied, "Well, I was ordered to gather some flowers around the border, early tomorrow morning"; that this order was made by Mrs. Chandler. Dr. Victor Parkin examined the defendant at the county jail on or about April 7, 1925. He testified that in his opinion the defendant was paranoiac and at that time was suffering from delusions of persecution, of which the homicide was the direct result; that defendant did not know the difference

between right and wrong, by reason of the fact that his belief in regard to what the deceased had been doing to him was false; that defendant believed he committed the act in self-defense; that defendant knew what he was doing when he killed decedent, but did not know the consequences of his act. On cross-examination the witness testified that he saw the defendant but once during a period of from one to one and one-half hours; that both sane and insane persons have mental delusions; that defendant was in a paranoiac state, which was the result of mental disease; that even though defendant felt impelled to commit the act under delusions which were false in fact, defendant probably knew that it was wrong to commit the act; that if defendant received a blow in the nature of a bullet wound in the head, it might cause delusions that would develop following the injury, but not such delusions as antedated the injury; that in his opinion the delusions of the defendant, inasmuch as they were the basis upon which he committed the act, existed prior to the defendant attempting to kill himself; that a recovery from such delusions may follow custody or care. Dr. D. H. Calder testified that he was a member of the lunacy commission when the defendant was committed to the asylum in April, 1925; that in his opinion the defendant was insane at that time, but that he could not state the duration of insanity; that the delusion of persecution had been of long standing; that although defendant might have known it was wrong to kill, yet he might have absolutely no restraint upon himself; that in his opinion the entrance of the bullet into the head of defendant would not have created delusions which existed in the defendant's mind; and that he doubted if the paranoiac state was ever recoverable. Defendant took the witness-stand and testified that he had known the deceased for about nine months; that their relations were friendly; that on March 3, 1925, the deceased was in the garage working on the automobile; that the defendant was working on the lawn and went into the garage for a drink of water; that the deceased had not spoken to defendant for a week or ten days, and seemed kind of sullen; that when the defendant went into the garage he was struck in the head with something solid; that he remembered nothing that occurred thereafter; that he did not remember shooting him-

self, and did not remember the doctors examining him; he remembered being in the asylum for over two years. On cross-examination the defendant stated that he had never been suspicious of the deceased; that the deceased was standing in the garage when he went into it, and also when the defendant was struck on the head. The witness further testified that he realized he was on trial for murder and understood everything that was going on in the courtroom; that he had been discharged from the asylum as cured. C. W. Ostrum, one of the attorneys for defendant, testified that he first saw the defendant in the early part of March, 1925; that defendant told him he was being persecuted; that the man he killed wanted him to go downtown and had a gang there that wanted to beat him up and kill him; that the defendant had a peculiar glitter in his eye; that when he told the defendant that he was basing his defense on insanity, the defendant attacked him; that in his opinion the defendant was insane at that time. On cross-examination the witness testified that the defendant told him he shot Repensek, but that he was justified. It was then stipulated that the defendant was shot over the right eye about the 3d of March, the date of the alleged homicide; that subsequently the defendant was committed to the asylum under an order of a judge of the superior court; and that defendant was in the asylum for two years. But one witness was called in rebuttal for the prosecution. Mrs. Pauline Pearl testified that defendant called on her on Sundays for a period of six months before the killing of the deceased; that she never noticed anything peculiar about him, and that he was a perfect gentleman; that all his actions were those of a sane man; that defendant never told her that people were plotting against him or persecuting him, or that he was suspicious of any person, or that he had troubles with any other persons; that she and the defendant were friends at all times.

Appellant urges that the uncontradicted evidence shows that the defendant was insane when Repensek was killed, insane at all times pending trial, during the trial and at the time of sentence. He takes the position that the evidence shows that defendant was paranoiac before, at the time of and after the offense was committed, and therefore was not capable of committing the crime charged in the

information. The evidence upon which appellant bases his contention that the evidence was not sufficient to support the verdict is the testimony of Doctors Parkin and Calder; of the arresting officer that at the time he arrested defendant, defendant acted like a "mad bull"; the fact that some years prior to the homicide the defendant had some trouble in Kansas City; and the fact that defendant was committed to an asylum soon after the homicide. It should be remembered that the testimony of the arresting officer was based upon his observation of the defendant immediately after the defendant had attempted to take his own life by shooting himself in the head; also, that the observation of the alienists should be considered with the fact that the examinations were made soon after the defendant had shot himself. Pauline Pearl, an intimate acquaintance of the defendant, who testified concerning the defendant's actions for a period of six months prior to the homicide, stated that all of his actions were those of a sane man, and that she observed no peculiarities whatsoever. There was also testimony before the jury as to defendant's actions immediately surrounding the homicide, which the jury were entitled to take into consideration; and the prosecution might rely upon the presumption of sanity in controverting the testimony of the alienists. The weight and credibility to be given to these witnesses was solely for the jury and the testimony was to be considered by the jury in connection with all of the other evidence as to the acts and conduct of the defendant; all of which was material to the question of insanity. ▆ The rule is well settled in this state that a person charged with crime is presumed to be sane until the contrary is established by a preponderance of evidence, and that insanity interposed as a defense in a criminal action means such a diseased and deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act he is charged with doing; or, if he did know this, incapable of distinguishing between right and wrong in relation to such act. (*People* v. *Williams*, 184 Cal. 590 [194 Pac. 1019].) ▆ In the present case there was some evidence tending to show insanity, but there was also evidence tending to show the defendant was sane. Under such evidence it was clearly a question of fact for the jury to determine whether at the

time of the homicide the defendant was sane; and the finding of a jury on conflicting evidence will not be disturbed in this court. (*People* v. *Nino*, 183 Cal. 126 [190 Pac. 626]; *People* v. *Loomis*, 170 Cal. 347 [149 Pac. 581].)

Appellant urges that there can be no doubt that defendant was insane at the time the offense was committed, since within one month after the commission of the offense the defendant was tried by the lunacy commission and pronounced insane, and that the same persons who examined the defendant at that time were witnesses in this case. The judgment of insanity necessarily was that the defendant was insane at the time the judgment was pronounced, and not that defendant was insane at the time the offense was committed. The issue as to whether the defendant was insane at the time the offense was committed was decided by the jury in this trial upon conflicting evidence.

Appellant complains of the language used by the court, commencing with the word "therefore" in the latter part of the following instruction:

"Insanity, as the expression is used in these instructions, means such a diseased and deranged condition of the mental faculties as to render the person incapable of distinguishing between right and wrong in relation to the act with which he is charged. An irresistible impulse to commit an act which a party knows to be wrong and unlawful (if it ever exists) does not constitute the insanity which is a legal defense. The standard of accountability is this: Had the party sufficient mental capacity to appreciate the character and quality of the act? Did he know and understand that it was a violation of the rights of another, and in itself wrong? Did he know that it was prohibited by the laws of the land, and that its commission would entail punishment and penalties upon himself? If he had the capacity thus to appreciate the character and comprehend the possible or probable consequences of his act, he is responsible to the law for the act thus committed, and is to be judged accordingly. Although it is true, as you have been instructed, that generally the burden of proof is upon the prosecution, yet to this rule there is this exception: Where insanity is relied upon as a defense, the burden of proving the existence of such insanity is on defendant, and

it is incumbent upon him to establish, by preponderance of evidence, that he was insane at the time of committing the act charged, and the evidence of mental derangement must be such, in amount, that if the single issue of sanity or insanity of the defendant should be submitted to the jury in a civil case they must find that he is insane. Insanity must be established by a preponderance of the evidence. Therefore, if you believe that the preponderance of evidence is in favor of the sanity of the defendant, or that there is not a preponderance of evidence to the effect that he was insane, at the time of the transaction involved herein, you will act upon the hypothesis that he was sane at that time. And in considering the evidence relative to the defense of insanity, it will be proper for you to remember that ordinary experience teaches us that the majority of men are sane, and hence it is to be presumed, until the contrary is proven by a preponderance of evidence, that the defendant was sane at the time of the commission of the act with which he stands charged, if you find from the evidence he committed such act."

The principles laid down by the foregoing instruction are in accord with those pronounced in *People* v. *Williams, supra,* and *People* v. *Loomis, supra.* The case cited by appellant (*People* v. *Kelley,* 7 Cal. App. 554 [95 Pac. 45]) is to be distinguished from the present case in that the jury in effect were told in that case that, even though they believed the defendant insane, they could not find him not guilty of any crime included within that charged in the information other than murder of the first degree. In the Kelley case the court instructed the jury: "If you believe and find from the evidence that the defendant was, at the time of the alleged killing, insane from any cause, either of a temporary or settled nature, then you should not find the defendant guilty of murder in the first degree, for if insane he could not form that wilful, deliberate, premeditated and malice aforethought intent which the law absolutely requires to constitute murder in the first degree." As stated by the court, the vice of the instruction was that there was not in any other of the court's instructions an instruction that, "if the defendant was shown by sufficient proof to have been insane at the time of the commission of the act, he was thereby under our law absolved from

responsibility for the same, and, consequently, entitled to an absolute acquittal, or a verdict of not guilty of any offense comprehended in the charge preferred against him.'' In the present case the jury was instructed that: ''The court instructs you that an insane person is not capable of committing a crime, and if you believe beyond a reasonable doubt that the defendant killed Godfrey Repensek as alleged in the information, still if you are satisfied from the evidence that the defendant was insane at the time of the commission of the act, you must find the defendant not guilty.'' Thus the jury were clearly instructed to find the defendant not guilty of any charge embraced in the information, if they found from the evidence that the defendant was insane at the time of the commission of the act.

■ Appellant's contention that the burden was upon the prosecution to prove insanity is without merit. The rule that insanity once shown to exist is presumed to exist until the contrary is shown arises only when it is shown that the intellectual faculties are so impaired as to produce a general, habitual derangement of them, not traceable to a temporary cause. (*People* v. *Francis,* 38 Cal. 183, 189.)

■ in the present case it was not shown that the defendant had ever been adjudged insane prior to the homicide, nor that the intellectual faculties of the defendant were so impaired before the offense was committed as to produce a general, habitual derangement of them; but there was sufficient evidence for the jury to find that defendant was sane before and at the time the offense was committed, and accordingly to find the defendant guilty.

■ Appellant contends that defendant should not have been brought to trial, but that he should have been returned to the asylum. The record is silent as to the defendant having been returned by the officers of the asylum to Los Angeles County for trial. In view of this silence of the record, it will be presumed that the proceedings required by law were taken. (*People* v. *Farrell,* 31 Cal. 576, 580, 581.) The defendant did not request that he be again tried for sanity, and cannot be heard to complain on appeal that he was insane at the time of the trial. In *People* v. *Rice,* 83 Cal. App. 55 [256 Pac. 450], the court said (pp. 236 and 237): ''In the instant case no application was

made by any person to submit the question of the then mental status of the defendant to a jury for determination; in the absence of any such request and where no objection was made at the opening of the trial to proceeding therewith by the defendant, any irregularities, if there were such, in the procedure leading up to the bringing of the defendant from the state hospital before the superior court for trial, were immaterial and of no consequence, and did not in any way affect his substantial rights.''

■ During the closing argument the following colloquy occurred:

''Mr. Clark: Mr. Kendrick talked at considerable length of the insane asylum as a worse place than the penitentiary or death. But we can exclude that from consideration, ladies and gentlemen. The Lunacy Commission or the persons in charge of the insane asylum at Stockton have found that this man was sane. This man could not be returned to the insane asylum.

''Mr. Kendrick: If the Court please, I hate to interrupt, but I want to assign that remark as prejudicial error and misconduct of the district attorney, and ask that the jury be instructed to disregard it. There is no evidence of that. He has never been declared sane. It is not true he cannot be sent back to the asylum immediately upon the end of this trial.

''Mr. Clark: The evidence is that he was declared sane, and was released from the asylum, by the defendant's own statement. If he was not sane he would not be and could not be tried here.

''The Court: It will be for the jury to determine and remember what the evidence does show upon that point. They will be governed by the evidence and will not be governed by the statements of counsel as to what the evidence is, when counsel are not in accord with each other.''

In view of the statement of the trial court that the jury would determine and remember what the evidence shows and will be governed by the evidence and not be governed by the statements of counsel when counsel are not in accord with each other, we do not believe defendant was prejudiced by the statement made by the district attorney,

even though there be no evidence shown that defendant was released from the asylum as being sane, except by the defendant's own testimony on cross-examination. The circumstances in this case are such that the defendant was brought to trial after having been committed to the asylum, and the record being silent as to his having been discharged from the asylum as being cured, except with respect to his own testimony, the presumption arises that all proper steps were taken as required by law before defendant was brought to trial. (*People* v. *Farrell*, 31 Cal. 576, 581.) While it was error for the district attorney to state that "this man could not be returned to the insane asylum," yet in view of the fact that the evidence was sufficient to support a finding that defendant was not insane at the time the offense was committed, and, further, that no objection was made on behalf of defendant that he was insane at the time of trial, or that he be tried as to his sanity at the time of the trial, we conclude that the error complained of was not prejudicial.

The judgment and the order denying the motion for a new trial are affirmed.

Houser, Acting P. J., and York, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 16, 1928.

All the Justices concurred.