## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2012-NMSC-015**

**Filing Date:   May 21, 2012**

**Docket No. 32,055**

**STATE OF NEW MEXICO,**

        **Plaintiff-Appellee,**

**v.**

**HARRISON LARGO,**

        **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY**
Grant L. Foutz, District Judge

Jacqueline L. Cooper, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Joel Jacobsen, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**MAES, Chief Justice**

**{1}**      In this case we apply the context-specific inquiry established by the United States Supreme Court in *Michigan v. Bryant*, 562 U.S. ___, 131 S.Ct. 1143 (2011), to evaluate whether an out-of-court statement is testimonial.  Defendant Harrison Largo's main issues concern the admission into evidence of Victim Freida Smith's out-of-court statements: portions of the 911 tape in which Victim communicated to the 911 operator that Defendant shot her, and a sheriff's deputy's testimony that Victim identified Defendant as her shooter. For the reasons that follow, we affirm Defendant's convictions.

1

**FACTS AND PROCEDURAL HISTORY**

**{2}**     Defendant and Victim had been in an on-again, off-again relationship for twenty years, during which they had two children.  On the morning of May 20, 2008, Defendant, still drunk from the day before, showed up at Victim's trailer.  Victim let him inside and Defendant told Victim that he wanted to reconcile their relationship.  Victim told Defendant she was not open to reconciliation.   The two then went outside the trailer where an altercation ensued, and Defendant shot Victim, who later died of her gunshot wounds.

**{3}**     Victim's neighbor, Stevic Jim (Stevic), witnessed the altercation and the shooting from his home.  After Defendant drove away, Stevic went outside to help Victim, who was lying on the ground bleeding, while his mother, Shirleen Jim (Shirleen), called 911.  Shirleen then gave the phone to Stevic and the 911 operator asked who shot Victim.  With Stevic acting as a relay, Victim told the 911 operator that it was Defendant.

**{4}**     Victim was still lying on the ground bleeding when McKinley County Sheriff's Deputy Ed Marble (Deputy Marble) arrived.  Victim also told Deputy Marble that Defendant shot her.  Significantly, she also told the deputy that Defendant "was headed to the school to shoot the kids."  Thoreau High School was subsequently locked down.

**{5}**     Victim was transported to a hospital in Albuquerque, where she died around six hours after being shot.  Defendant was charged with one count of deliberate first-degree murder, contrary to NMSA 1978, Section 30-2-1(A) (1994), and one count of tampering with evidence, contrary to NMSA 1978, Section 30-22-5 (2003).

**{6}**     At trial, the district court admitted Victim's out-of-court statements in two forms.  First, the district court admitted into evidence portions of the 911 tape where Victim communicated to the 911 operator, through Stevic, that Defendant had shot her.  Second, the district court allowed Deputy Marble to testify regarding Victim's out-of-court statement in which she identified Defendant as her shooter.  Deputy Marble testified:  "I asked [Victim], 'What happened?' and she said, 'Harrison shot me.'"  The district court ruled that any evidence regarding Victim's fear that Defendant was headed to Thoreau High School, however, was too prejudicial, and therefore was not presented at trial.

**{7}**     Defendant was convicted of both counts and was given a life sentence for the murder count and three years for the tampering with evidence count.  Defendant appeals his conviction directly to this Court.  *See* N.M. Const. art. VI, § 2; *see also* Rule 12-102(A)(1) NMRA (providing that an appeal from a sentence of life imprisonment is taken directly to the Supreme Court).

**{8}**     Defendant raises three issues on appeal:  (1) whether Victim's out-of-court statements identifying Defendant as her assailant were testimonial in nature, thereby violating Defendant's confrontation rights under the federal constitution; (2) whether Victim's out-of-court statements identifying Defendant as her assailant were inadmissible

2

hearsay; and (3) whether there was sufficient evidence to support a conviction for deliberate first-degree murder.

**DISCUSSION**

**I.      Defendant's confrontation rights were not violated by the admission of Victim's out-of-court statements identifying Defendant as her shooter because the statements were nontestimonial.**

**{9}**      The question whether out-of-court statements are admissible under the Confrontation Clause is a question of law, subject to de novo review. *State v. Aragon*, 2010-NMSC-008, ¶ 6, 147 N.M. 474, 225 P.3d 1280. The Confrontation Clause of the Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *see* N.M. Const. art. II, §14. The Confrontation Clause bars "[o]ut-of-court *testimonial* statements . . . unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness . . . ." *State v. Zamarripa*, 2009-NMSC-001, ¶ 23, 145 N.M. 402, 199 P.3d 846 (emphasis added) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). In *Davis v. Washington*, 547 U.S. 813 (2006), the United States Supreme Court clarified the rule it laid down in *Crawford*, regarding when statements are testimonial, and provided:

> [S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to [a] later criminal prosecution.

*Davis*, 547 U.S. at 822.

**{10}**      Defendant asserts that Victim's out-of-court statements were testimonial in nature and therefore inadmissible. In response, the State argues that, because Victim's out-of-court statements identifying Defendant as her shooter had a primary purpose of addressing an ongoing emergency, their admission into evidence did not violate Defendant's confrontation rights. Because there is no dispute that Defendant did not have a prior opportunity to cross-examine Victim, this dispute centers on whether her out-of-court statements were testimonial.

**{11}**      More recently in *Bryant*, the Supreme Court addressed whether statements made by a shooting victim to police while he was lying on the ground in severe distress waiting for medical attention were testimonial and should be barred from use at trial by the Confrontation Clause. In *Bryant*, police responded to a 911 call reporting that a man had been shot. 131 S.Ct. at 1150. When police arrived at the scene they found the victim with

3

a gunshot wound in his abdomen, in great pain, and speaking with much difficulty. *Id.* The "police asked [the victim] 'what happened, who had shot him, and where the shooting had occurred.'" *Id.* The victim responded by identifying his shooter and explaining that he had been shot at another location before driving to the gas station for help. *Id.* The victim's conversation with police lasted approximately five to ten minutes. *Id.* The victim was transported to a nearby hospital where he later died. *Id.*

**{12}**    In *Bryant*, the Court reaffirmed that "the basic objective of the Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements *taken for use at trial*."*Id.* at 1155 (emphasis added). The Court concluded that "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Id*. at 1162 (quoting *Davis*, 547 U.S. at 814); *accord People v. Blacksher*, 259 P.3d 370, 408 (Cal. 2011)). While the Court acknowledged that there may be other circumstances "when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony," *Bryant*, 131 S.Ct. at 1155, "[t]he existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account." *Id.* at 1162; *see also Blacksher*, 259 P.3d at 408. Accordingly, the Court first looked to the circumstances surrounding the interrogation to determine if there was an ongoing emergency, then viewed the conduct of the interrogators and the declarant in light of that determination. *See Bryant*, 131 S.Ct. at 1163-66. This is a "highly context-dependent inquiry," *id.* at 1158; *accord Blacksher*, 259 P.3d at 409, and requires courts to objectively evaluate *all* of the circumstances surrounding the interrogation, as well as the statements and actions of the parties to the encounter, *see Bryant*, 131 S.Ct. at 1162.

**{13}**    In *Bryant*, the Court looked to the type and scope of the danger posed to the victim, to the public, and the police to determine the existence of an ongoing emergency. *Id.* The Court noted that "[n]othing . . . said to the police indicated that the cause of the shooting was a purely private dispute or that the threat from the shooter had ended," indicating that the scope of the danger to the general public could be high. *Id.* at 1163. The record did not reveal much about the motive of the shooter, leaving police to wonder about the scope of the danger to the public. *Id.* In addition, the fact that a gun was used further increased the scope of the danger, not only to the victim, but to the police and the general public as well. *Id.* at 1164. The Court noted that a slight physical separation, sufficient in prior cases to end an emergency such as an unarmed domestic dispute, does not create the same level of safety in a case where a gun was used, especially when the police do not know where the assailant is. *Id.* Based on these facts—"an armed shooter, whose motive for and location after the shooting were unknown, had mortally wounded [a victim] within a few blocks and a few minutes of the location where the police found [the victim]"—the Court concluded "there was an ongoing emergency." *Id.*

4

**{14}**     The circumstances surrounding the interrogation in *Bryant* are very close to those in the present case.  In both cases, the victims were shot and the location of the shooter was unknown.  In addition, both interrogations lacked the formality involved in an interrogation conducted at a police station, another important consideration of the *Bryant* Court.  *Id*. at 1160 (providing "formality suggests the absence of an emergency"); *Blacksher*, 259 P.3d at 409.  In both cases the interrogations were quick, unstructured, and conducted at the location where the victim was found.  In fact, the entire conversation between Victim and Deputy Marble lasted approximately 30 to 45 seconds.  These types of circumstances suggest the existence of an ongoing emergency.

**{15}**     The major difference in the circumstances of the two cases is that the present case involved a domestic dispute, while *Bryant* did not.  Generally, "[d]omestic violence cases . . . often have a narrower zone of potential victims than cases involving threats to the general public." *Bryant*, 131 S.Ct. at 1158.  Such is not the case here, however.  Victim told Deputy Marble that Defendant "was headed to the school to shoot [their] kids." Rather than a speculative threat to the public based on a shooter with an unknown motive on the loose as in *Bryant*, we have, at least, an allegation of a direct threat against specific individuals.  The local high school was subsequently locked down, outwardly indicating that Deputy Marble considered the threat to the public to be very real.  The threat to the public and police in this case was further compounded by the fact that Defendant was a former SWAT team member, so much so that Deputy Marble urged his fellow officers to use caution with Defendant.  In light of these circumstances and their similarity to those in *Bryant*, we have no difficulty concluding that there was an ongoing emergency in this case.

**{16}**     However, "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry; rather, the ultimate inquiry is whether the primary purpose of the interrogation was to enable police assistance to meet the ongoing emergency." *Id.* at 1165 (internal quotation omitted).  Even in the face of an ongoing emergency, an interrogation's primary purpose "can evolve into testimonial statements." *Id.* at 1159 (internal quotation marks and citation omitted); *accord Blacksher*, 259 P.3d at 409.  The actions and statements of both the interrogator and the declarant may illuminate the *primary* purpose of the interrogation.

**{17}**     The *Bryant* Court emphasized that looking at the conduct of both the interrogator and declarant, helps to "ameliorate[ ] problems that could arise from looking solely to one participant.  Predominant among these is the problem of mixed motives on the part of both interrogators and declarants." *Id.* at 1161; *accord Blacksher*, 259 P.3d at 408.  The Court recognized that police officers serve both as first responders and criminal investigators and that they may act with different motives in quick succession.  *Bryant*, 131 S.Ct. at 1161; *Blacksher*, 259 P.3d at 408.  A victim could also have mixed motives, such as wanting the immediate threat to end while not wishing the assailant be prosecuted.  *Bryant*, 131 S.Ct. at 1161; *Blacksher*, 259 P.3d at 408.  Accordingly, in addition to the circumstances in which an encounter occurs, a court must objectively look at the statements and actions of both the declarant and interrogators to make the primary purpose determination.  *Id.*

**{18}** The *Bryant* Court noted that when police first arrived at the gas station where the victim was lying on the ground

> they did not know why, where, or when the shooting had occurred. Nor did they know the location of the shooter or anything else about the circumstances [of the shooting]. The questions they asked–what had happened, who had shot him, and where the shooting occurred,–were the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public.

*Bryant*, 131 S.Ct. at 1165-66 (internal quotation marks and citation omitted). The Court then concluded that the police officers "solicited the information necessary to enable them to meet an ongoing emergency." *Id.* at 1166 (internal quotation marks and citations omitted).

**{19}** Even though the present case involves two separate interrogators, the 911 operator and Deputy Marble, the same can be said about each of them. Shirleen initially told the 911 operator that a "guy had shot a lady." In response, the 911 operator asked a series of questions, similar to the questions posed by the police officers in *Bryant*, that were targeted to assess the seriousness of the ongoing emergency. The 911 operator asked questions regarding where the shooter went, the type of vehicle he was using, the name of the victim, the type of gun used, who the shooter was, and Victim's medical condition. Similarly, when Deputy Marble arrived he asked Victim "What happened?" These are precisely the types of questions the *Bryant* Court concluded, in light of the surrounding circumstances, "solicit[] the information necessary to enable [first responders] to meet an ongoing emergency." *Id.*

**{20}** Finally, in this case, the conduct of Victim, similar to the conduct of the victim in *Bryant*, indicates that the statements Victim made were nontestimonial. In each case, the victim was in considerable pain, bleeding from a mortal gunshot wound to the abdomen, and had considerable difficulty breathing and talking. *See id.* at 1165. In this case, Victim was found on the ground in a pool of her own blood and urine, and at one point was crying out for her mother. Such a severely injured victim suggests that the answers to the questions were merely reflexive, with no purpose at all, much less a testimonial one. *See id.* at 1161; *Blacksher*, 259 P.3d at 409. Just as the victim in *Bryant* interspersed questions about when medical services would arrive with his answers to police questions, here Victim repeatedly expressed fear for her children's safety during her questioning—indicating in each instance that the victim's primary concern was not the future prosecution of the assailant. Therefore, as the Court concluded in *Bryant*, "we cannot say that a person in [Victim's] situation would have had a primary purpose to establish or prove past events potentially relevant to later criminal prosecution." *Bryant*, 131 S.Ct. at 1165.

**{21}** We find the relevant circumstances in this case nearly identical to those in *Bryant*. Accordingly, we hold Victim's statements to Deputy Marble and the 911 operator were nontestimonial, and did not violate Defendant's right to confrontation.

6

**II. Victim's out-of-court statements identifying defendant as the individual who shot her were properly admitted as a dying declaration exception under hearsay Rule 11-804(B)(2).**

**{22}** Because we concluded that the admission of Victim's out-of-court statements did not violate Defendant's confrontation rights, we must now determine whether her out-of-court statements were properly admitted under Rule 11-804(B)(2). We review the admission of evidence pursuant to an exception or an exclusion to the hearsay rule under an abuse of discretion standard by which deference is given to the district court's ruling. *State v. Lopez*, 2011-NMSC-035, ¶ 4, 150 N.M. 179, 258 P.3d 458 (citing *State v. McClaugherty*, 2003-NMSC-006, ¶ 17, 133 N.M. 459, 64 P.3d 486). We will not conclude that the district court abused its discretion in admitting evidence pursuant to an exception or an exclusion to the hearsay rule unless "the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Flores*, 2010-NMSC-002, ¶ 25, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted).

**{23}** Defendant contends that Victim's out-of-court statement in which she identified Defendant as her shooter to Deputy Marble and the 911 operator did not fall within any of the exceptions to the hearsay rule. In response, the State asserts that Victim's out-of-court statements qualified as dying declarations.

**{24}** Hearsay "consists of an out-of-court statement offered to prove the truth of the matter asserted, and is inadmissible as substantive evidence unless it falls within an exclusion or exception to the hearsay rule." *Lopez*, 2011-NMSC-035, ¶ 5 (internal quotation marks and citation omitted); *see* Rule 11-801(C) NMRA (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); Rule 11-802 NMRA (providing "[h]earsay is not admissible except as provided by these rules or by other rules adopted by the supreme court or by statute").

**{25}** Victim's out-of-court statements identifying Defendant as her shooter were clearly hearsay as defined by Rule 11-801(C) as she was not present to testify at trial, and the out-of-court statements identifying Defendant as her shooter were offered to prove that Defendant shot her. Therefore, in order for Victim's out-of-court statements to have been properly admitted at trial, the statements must have fallen within an exception or exclusion to the hearsay rule. *See, e.g.,* Rules 11-803(A), (B), & (C) NMRA; Rule 11-804(B)(2).

**{26}** We will first address whether Victim's out-of-court statements identifying Defendant as her shooter were "dying declaration[s]." Rule 11-804(A) & (B)(2)(3) ("[S]tatement[s] made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death" are not excluded by the hearsay rule if the declarant is unavailable as a witness.). A dying declaration, or "statement under [the] belief of impending death," is admissible when there is a showing that the declarant made the statement while conscious and under the realization

7

that death was approaching. *State v. Quintana*, 98 N.M. 17, 19, 644 P.2d 531, 533 (1982). Therefore, "[i]f it can reasonably be inferred from the state of the wound or the state of the illness that the dying person was aware of his [or her] danger, then the requirement of impending death is met." *Id.* at 20, 644 P.2d at 534.

{27} Here, the district court considered the circumstances surrounding Victim's statements and reasonably inferred that she was aware of her current state and believed that her death was imminent. Victim was shot multiple times. She was lying on the ground in a near fetal position, bleeding, complaining of pain in the abdominal area, and experiencing shallow breaths. She had urinated on herself and there appeared to be blood in her urine. She tried to hold her torso up with her forearms but was unable. She expressed concern for her children, and called out for her mother. She died around six hours later. Accordingly, we hold that the district court did not abuse its discretion by admitting Victim's out-of-court statements into evidence as a dying declaration under Rule 11-804(B)(2).

{28} Because we conclude that the district court did not abuse its discretion in admitting Victim's out-of-court statements under Rule 11-804(B)(2), we do not address the parties' arguments concerning the other hearsay exceptions. *See State v. Combs*, 2011-NMCA-107, ¶ 6, 150 N.M. 766, 266 P.3d 635 (providing when a reviewing court's conclusion on one point resolves an issue, the reviewing court need not address the parties' additional arguments).

### III. Sufficient evidence supports Defendant's deliberate intent to commit first-degree murder.

{29} Defendant argues that this Court should reverse his conviction because there was insufficient evidence to support his conviction of deliberate, first-degree murder and asserts that, at most, the evidence established an "undeliberated crime of passion," which could be either manslaughter or second-degree murder. The State counters that Defendant's "decision to aim the gun at [Victim] three separate times, overcoming some degree of physical resistance the second and third times," indicates that Defendant did not act impulsively, but rather acted with a deliberate intent to kill.

{30} "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Riley*, 2010-NMSC-005, ¶ 12, 147 N.M. 557, 226 P.3d 656 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. In reviewing whether there was sufficient evidence to support a conviction, "we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted). "[D]etermining the sufficiency of [the] evidence does require appellate court scrutiny of the evidence and supervision of the jury's fact-finding

8

function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Id.* (internal quotation marks and citation omitted).

**{31}** The requisite state of mind for first-degree murder is a "willful, deliberate and premeditated" intention to kill. NMSA 1978, § 30-2-1(A)(1) (1994); *see State v. Duran*, 2006-NMSC-035, ¶ 6, 140 N.M. 94, 140 P.3d 515. New Mexico's Uniform Jury Instruction 14-201 NMRA, defines the term deliberate as a "means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." Although deliberate intent requires a "calculated judgment" to kill, the weighing required for deliberate intent "may be arrived at in a short period of time." UJI 14-201. In determining whether the defendant made a calculated judgment to kill, the jury may infer intent from circumstantial evidence because direct evidence of the defendant's state of mind is not required. *Duran*, 2006-NMSC-035, ¶ 7.

**{32}** The jury was instructed that in order to find Defendant guilty of deliberate, first-degree murder, the State needed to prove beyond a reasonable doubt that

1.    The [D]efendant killed [Victim];

2.    The killing was with the deliberate intention to take away the life of [Victim];

3.    The [D]efendant was not suffering from intoxication at the time the offense was committed to the extent of being incapable of forming an intent to take away the life of another;

4.    This happened in New Mexico on or about the 20th day of May, 2008.

The jury was also instructed on the definition of "deliberate intention." The instruction provided:

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of actions. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reason for and against such choice.

9

**{33}** Victim's neighbor, Stevic, testified that from his living room window he heard a commotion and witnessed Victim kneeling on the ground as Defendant stood over her pointing a rifle at her head. Stevic reported that Victim attempted to push the rifle away from her face twice, and that after both attempts Defendant repositioned the rifle so that it was pointing directly back at her face. Stevic further testified that as Defendant was pointing the rifle at Victim's face, he observed her pleading with Defendant. Stevic testified that Defendant fired four close range shots directly at Victim. The State's medical investigator also testified that the autopsy revealed five wounds on her body. Four wounds were penetrating. The fifth was a graze wound from one of the bullets before entering her body. Such evidence indicates that a reasonable jury could have concluded that Defendant weighed and considered his decision to kill, before shooting Victim four times.

**{34}** The jury also heard testimony from Richard Johnson (Johnson), the owner of the Frontier Trading Post in Milan, who interacted with Defendant within an hour after Defendant had left the trailer park. In response to questions regarding whether Defendant appeared intoxicated, Johnson testified that Defendant was "rather loud and obnoxious" but did not appear to be intoxicated. Johnson further testified that Defendant asked to use the phone, and that during the conversation he overheard Defendant tell someone that he "wouldn't be in to work for a week." The State also called Debbie Olivar (Olivar), a woman Defendant called from the Frontier Trading Post, to testify regarding what was said during the phone call. Olivar testified that Defendant stated he needed a week's vacation, and that he was in a "heap of trouble."

**{35}** Accordingly, reviewing the evidence in the light must favorable to the verdict, there was sufficient evidence for the jury to find that Defendant acted with deliberate intent when he killed Victim.

## CONCLUSION

**{36}** We hold that Victim's out-of-court statements were nontestimonial and therefore did not violate Defendant's confrontation rights; that the district court did not abuse its discretion in admitting Victim's out-of-court statements under Rule 11-804(B)(2); and that there was sufficient evidence to support Defendant's conviction for first-degree murder.

**{37}** Accordingly, we affirm Defendant's convictions.

**{38}** **IT IS SO ORDERED.**

                  **PETRA JIMENEZ MAES, Chief Justice**

**WE CONCUR:**

**PATRICIO M. SERNA, Justice**

---

**RICHARD C. BOSSON, Justice**

---

**EDWARD L. CHÁVEZ, Justice**

---

**CHARLES W. DANIELS, Justice**

**Topic Index for *State v. Largo*, Docket No. 32,055**

| AE | **APPEAL AND ERROR** |
|----|-----|
| AE-SB | Substantial or Sufficient Evidence |

| CT | **CONSTITUTIONAL LAW** |
|----|-----|
| CT-CT | Confrontation |
| CT-RF | Right to Confrontation |

| CL | **CRIMINAL LAW** |
|----|-----|
| CL-DO | Domestic Violence |
| CL-MU | Murder |
| CL-TE | Tampering with Evidence |

| CA | **CRIMINAL PROCEDURE** |
|----|-----|
| CA-SE | Substantial or Sufficient Evidence |

| EV | **EVIDENCE** |
|----|-----|
| EV-DD | Dying Declaration |
| EV-HR | Hearsay Evidence |