This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date:   June 2, 2016**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.                                                                          **NO. S-1-SC-34815**

**PAUL LOVETT,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
Mark T. Sanchez, District Judge


Bennett Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant


Hector H. Balderas, Attorney General
Kenneth H. Stalter, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**VIGIL, Justice.**

**{1}** Defendant appeals his conviction for first-degree murder, contrary to NMSA 1978, Section 30-2-1(A) (1994). Defendant challenges his conviction on three grounds, arguing that: 1) the trial court erred by failing to either grant a mistrial or to voir dire interview alternate jurors after the State inadvertently violated a stipulation agreement by using a different murder victim's name during examination of a witness; 2) the trial court erred by failing to declare a mistrial when prospective jurors saw Defendant in the company of uniformed detention officers; and 3) there was insufficient evidence to support a verdict of first-degree murder because the State failed to prove that Defendant was the killer and that his conduct was willful, deliberate and premeditated.

**{2}** We reject each of the Defendant's claims of error and affirm his conviction for first-degree murder. We render this non-precedential decision because settled New Mexico law controls each of the issues raised by Defendant. *See* Rule 12-405(B)(1) NMRA.

**I.    BACKGROUND**

**{3}** In 2002 Paul Lovett (Defendant) was convicted, in a joint trial, of two counts of first-degree murder for the killings of Elizabeth Garcia (Victim) and Patty Simon.

*State v. Lovett*, 2012-NMSC-036, ¶ 1, 286 P.3d 265. In Defendant's capital appeal from those convictions, this Court reversed the conviction for Victim's murder due to impermissible joinder. *Id.* ¶ 37. The details of the previous trial and appeal can be found in this Court's opinion in *State v. Lovett*, 2012-NMSC-036. Upon remand of the vacated conviction for a new trial, Defendant was again convicted of first-degree murder for killing Garcia, and that conviction forms the basis of the instant capital appeal. The facts and evidence presented in the second trial are as follows.

{4}    On January 15, 2002, Victim worked the night shift at a gas station in Hobbs, New Mexico. In the early morning of January 16, 2002, between 2:15 a.m. and 3:00 a.m., Victim's boyfriend discovered she was missing. He also discovered that her homework book had been left open on a counter inside the gas station and her car was still parked outside. A store manager confirmed that the cash register's last transaction occurred at 2:24 a.m., and that $12.49 was missing from the drawer. The panic alarm was never activated.

{5}    Victim's body was discovered in a vacant lot; she was clothed, but her shirt was pulled up around her neck. Police observed tire tracks, two distinct sets of shoe impressions, and "drag marks or gouges" leading from the tire tracks to Victim's body. There were claw marks and a clump of Victim's hair found in the dirt. Victim

had defensive wounds on her arm, twenty-seven wounds on her left front chest, and abrasions to her face consistent with "falling on her face . . . during the struggle." Though there were incise wounds to her neck, they did not go deep enough to sever any major arteries. She died slowly of blood loss, after being stabbed fifty-six times and sustaining multiple incise wounds.

{6} Following the murder police questioned Shelly Terrell, who was married to Defendant at the time, because her brother Stephen DeMoss was a possible suspect. Defendant was present and was in a position to overhear the interview. Shortly after that interview, Defendant appeared at home crying and told Terrell that he had to leave and start over. He then left for Alabama with another woman. Terrell ultimately testified that on the night of the murder Defendant was home when she went to bed, that she did not hear him leaving or showering in the night, and that she did not notice soiled clothing or anything unusual about Defendant's physical appearance.

{7} The case went cold until a year and a half later, in June 2003, when police finally questioned Defendant about Victim's murder. At this time, Defendant revealed to the detective that on January 15, 2002, DeMoss came to him claiming that some unknown persons had threatened to kill DeMoss if DeMoss did not give them some DNA. In response, Defendant gave DeMoss his own pubic hairs and semen in a

4

condom. Defendant claimed he had withheld this information from the authorities "because that's such a weak little statement right there that I could be very well convicted of killing somebody." During the interview Defendant denied killing Victim, instead pinning the murder on DeMoss because he was under the impression that DeMoss had never actually come under that alleged threat by some unknown person. Until then, investigators were not aware that Defendant's DNA was present inside Victim's underwear. Over the course of that interview, Defendant would state "I'm just fucked," and "[t]here's not a way out."

{8} An expert in DNA analysis testified at trial that a mixture of DNA was present on Victim's underwear. The DNA mixture contained DNA from a major male contributor, a female contributor, and a third minor contributor. The expert testified that Defendant was the major male contributor to the DNA mixture, that Victim was the female contributor, and that the source of the third minor contribution remained unknown to him. The expert's DNA analysis also excluded four other male suspects as contributors to the DNA mixture, including DeMoss.

{9} The tire tracks at the scene were identified as being consistent with the BF Goodrich Advantage Plus brand, sold only at Sam's Club, designed to fit on vehicles with a fifty-five inch wheelbase. Terrell provided evidence that during a trip to Kansas

5

in 2001 she and Defendant purchased BF Goodrich brand tires from Sam's Club for their brown, four-door, and fifty-five inch wheelbase Ford Taurus. The receipt lists the tires as model "820449 205/65 ADV+." This particular tire model, a detective testified, was consistent with the tire tracks left at the murder scene. A qualified expert witness in tire-track identification independently analyzed the tire tracks and also testified that they were consistent with the BF Goodrich Advantage Plus brand. The tires were never recovered because the Taurus was not located until late 2003 at a car dealership in Louisiana, and the tires had been changed.

{10} Photographs of Defendant wearing athletic shoes were introduced at trial. In these photographs Defendant is wearing the Nike Air Integrity shoe. A shoe box matching the Nike Air Integrity shoe was given to police by Defendant's former wife (of a marriage prior to Terrell). Investigators identified the shoe prints recovered at the murder scene as being consistent with the Nike Air Integrity outsole. Nike manufactured two other types of shoes with the same outsole as the Nike Air Integrity, namely the Nike Air Raceway and Nike Air Determination. Still, there were approximately 280,000 pairs of athletic shoes manufactured by Nike with the same outsole design as the shoe prints recovered at the murder scene. At trial a qualified expert witness in footwear identification examined the shoe prints left at the scene and

testified that they were consistent with the outsole of the Nike Air Integrity.

{11} Defendant called one witness in his defense who testified that he had gone to physical therapy at 7:45 a.m. on January 16, 2002, the morning after the killing, for approximately four hours and fifteen minutes. According to this witness, Defendant did not seem unusually fatigued, as he might have been had he been awake all night.

{12} The jury was instructed on the elements of first and second-degree murder, returning the guilty verdict for first-degree murder that Defendant now appeals.

## II. DISCUSSION

### A. The trial court did not abuse its discretion in denying the request for a mistrial, or the request to voir dire interview alternate jurors, based on the State's isolated reference to a murder victim from a separate trial

{13} Defendant first argues two claims of error. Defendant argues there was reversible error due to the trial court's refusal to grant his motion for a mistrial based on the State's inadvertent reference to Patty Simon, the name of the victim Defendant was convicted of killing in the joint 2002 trial. *See Lovett*, 2012-NMSC-036, ¶ 1. Defendant also claims that the trial court abused its discretion in denying his motion asking the trial court to conduct individual voir dire interviews of alternate jurors regarding the impact of the reference to Patty Simon. We hold that the trial court did not abuse its discretion in denying either Defendant's motion for a mistrial or his

7

motion to voir dire interview alternate jurors, and affirm the trial court.

{14}    Before trial, the parties agreed that there would be no reference to the murder of Patty Simon, for which Defendant was convicted of first-degree murder. On the sixth day of trial, as the State examined DNA analyst Brendan Shea the following exchange occurred:

State:      And just to clarify one last point, with respect to the, um, Patty Simon's panties, we talked about semen, and we also talked about sperm, is that correct?
Shea:      I'm sorry, counsel . . .
State:      We talked about semen and we talked about sperm with respect to the panty crotch of [Victim].
Defense:    Your Honor, may we approach?

The trial court then held a brief bench conference, and called a recess so the jury could leave the courtroom. Defendant moved for a mistrial, arguing that a ruling in his favor was necessary because the State's question was inherently prejudicial as the reference to Patty Simon may have refreshed the jurors' recollections of Defendant's previous trial. Defendant also argued that a curative instruction would not be adequate to cure the prejudice, and that any individual questioning would only reinforce the taint. The State responded that the reference was inadvertent, that it was both quickly corrected and unanswered, and that there was a thorough jury screening process that ensured that the selected jurors had no knowledge of the previous trial which was held in

8

another county. The trial court denied Defendant's motion to declare a mistrial, citing the careful jury selection process, the inadvertent nature of the reference, and the fact that the reference occurred in a question, rather than in an answer. Defendant renewed the motion for a mistrial at the close of the State's case, and it was again denied.

{15} Defendant also requested that the trial court interview alternate jurors in order to assess what impact, if any, the reference to Patty Simon had on the jury. The trial court denied Defendant's request, concluding that the reference was not inherently prejudicial because it occurred in a question by counsel, the jury was instructed that counsel's statements were not evidence, the defense was otherwise satisfied with the jury selected, and that in the trial court's own view of the proceedings the reference did not reflect any prejudicial impact.

{16} Additionally, earlier in the trial during the cross-examination of an expert witness who had performed Victim's autopsy, the expert responded to one of Defendant's questions by saying that "there was a fire in the warehouse of our files some years ago and then the records were destroyed, except for the autopsy report, which we keep electronically. And I suspect you have a copy because it was probably introduced at the last—." Defense counsel promptly interrupted the expert before he completed his answer that would have revealed the fact of the previous trial. A recess

9

was taken, and the parties entered into a stipulation that the witness would testify that the document previously referred to was made available "at the last hearing." Defendant now argues that the reference to Patty Simon, taken together with the autopsy expert's testimony, was sufficient to alert jurors to the fact that Defendant had been previously tried for the murder of Patty Simon.

**{17}** "A motion for a mistrial is addressed to the sound discretion of the trial court and is only reviewable for an abuse of discretion." *State v. Saavedra*, 1985-NMSC-077, ¶ 11, 103 N.M. 282, 705 P.2d 1133, *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783. "An [a]buse of discretion exists when the trial court acted in an obviously erroneous, arbitrary, or unwarranted manner." *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993 (alteration in original) (internal quotation marks and citation omitted). "[T]he power to declare a mistrial should be exercised with the greatest caution." *State v. Sutphin*, 1988-NMSC-031, ¶ 18, 107 N.M. 126, 753 P.2d 1314.

**{18}** Similarly, we review the trial court's denial of a motion to interview alternate jurors for an abuse of discretion, since trial courts have considerable discretion in choosing from a variety of remedies to address allegations of juror bias. *Gallegos*, 2009-NMSC-017, ¶ 29; *cf. State v. Benavidez*, No. 33,480, dec. ¶¶ 43-46 (N.M. Sup.

10

Ct. Nov. 7, 2013) (non-precedential) (reviewing denial of a defendant's request to question jurors for an abuse of discretion). We conclude that the trial court did not err in denying both Defendant's motions for a mistrial and to interview alternate jurors for the reasons that follow.

{19} Defendant argues that the mere mention of Patty Simon's name was inherently prejudicial to his constitutional right to a fair trial and an impartial jury as the reference to Patty Simon would have caused any juror paying close enough attention to recall that Defendant had in fact been previously charged in and tried for another murder. Defendant urges this Court to review the exposure of this prejudicial information to the jury under the framework governing midtrial publicity. In *State v. Holly*, 2009-NMSC-004, ¶¶ 5-6, 145 N.M. 513, 201 P.3d 844, after the jury had been empaneled, a local newspaper ran an article that the defendant argued caused a prejudicial exposure. We held that in the event of midtrial publicity:

> First, the trial court determines whether the publicity is inherently prejudicial. If so, the court undertakes to canvass the jury as a whole to assess whether any of the jurors were actually exposed to the publicity. Finally, in the event of exposure, the court conducts an individual voir dire of the juror to ensure that fairness of the trial has not been compromised.

*Id.* ¶ 19. In *Holly*, we set forth a litany of factors to consider when determining whether midtrial publicity was inherently prejudicial to a defendant:

11

(1) whether the publicity goes beyond the record or contains information that would be inadmissible at trial, (2) how closely related the material is to matters at issue in the case, (3) the timing of the publication during trial, and 4) whether the material speculates on the guilt or innocence of the accused. In addition, the trial court should consider the likelihood of juror exposure by looking at (1) the prominence of the publicity, including the frequency of coverage, the conspicuousness of the story in the newspaper, and the profile of the media source in the local community; and (2) the nature and likely effectiveness of the trial judge's previous instructions on the matter, including the frequency of instruction to avoid outside materials, and how much time has elapsed between the trial court's last instruction and the publication of the prejudicial material.

*Id.* ¶ 20.

{20}     The State responds that because the reference to Patty Simon did not come in the form of a news article or broadcast *Holly* does not apply. Instead, the State argues the trial court should use a different framework, one that we have developed to analyze improper comments by counsel, as set forth in *State v. Torres*, 2012-NMSC-016, ¶¶ 7-15, 279 P.3d 740. Under *Torres*, the relevant factors for determining the prejudicial effect of an improper statement by counsel are: "1) whether the statement invades some distinct constitutional protection; 2) whether the statement [was] isolated and brief, or repeated and pervasive; and 3) whether the statement [was] invited by the defense." 2012-NMSC-016, ¶ 10 (alterations in original) (internal quotation marks and citation omitted). "When these considerations lead to a

12

conclusion that the comments materially altered the trial or likely confused the jury by distorting the evidence, the State has deprived the defendant of a fair trial, and reversal is warranted." *Id.* (internal quotation marks and citation omitted). In *Torres*, this Court held that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial where the prosecutor called defense counsel a liar and then referenced information outside of the evidence in a closing statement. *Id.* ¶ 9.

{21} Both the *Holly* and *Torres* factors remain good guidelines for assessing either the prejudicial effect of midtrial publicity or an improper comment made by counsel during the course of trial, as the case may be. Here, though, we need not decide which framework is best suited to the unique circumstances of the case, because we reach the same conclusion under either. Under both frameworks our task is to ultimately decide whether the trial court abused its discretion in determining that the brief and inadvertent reference to Patty Simon was not inherently prejudicial and did not otherwise impair the fairness of Defendant's trial. *See Torres*, 2012-NMSC-016, ¶ 10 (explaining that the *Torres* factors are only guidelines, and the essential question is whether, in the unique context of any given case, a defendant received a fair trial); *Holly*, 2009-NMSC-004, ¶ 20 (advising trial courts to consider a myriad of factors in

13

order to determine if midtrial publicity was inherently prejudicial). We conclude that it did not.

{22} We agree with the trial court that the reference to Patty Simon was inadvertent and came in the form of a question from counsel, and thus was not inherently prejudicial to Defendant. The record supports that the reference was brief, the jury had been preemptively screened for knowledge of the previous trial, and the reference came from counsel, rather than from a witness. On this basis, we conclude, the trial court did not abuse its discretion in finding that there was no inherent prejudice to Defendant. Such is appropriate under both the *Torres* and *Holly* analytical frameworks.

{23} First, examining the comment under the *Torres* framework, counsel's inadvertent reference to Patty Simon was so brief and isolated that it did not impair the fairness of Defendant's trial. 2012-NMSC-016, ¶ 11 (looking at the prosecutor's conduct in the context of the whole trial, and determining it was not pervasive, outrageous, or unrelenting enough to hamper the fairness of the proceedings). Similarly, under the *Holly* framework, because the jury had been carefully screened and the inadvertent reference to Patty Simon by counsel was so brief, more information would have been needed for the jury to fully comprehend and consider

14

that Defendant had been previously tried for the murder of Patty Simon. *See* 2009-NMSC-004, ¶ 21. Thus, the trial court reasonably concluded that there had been no inherently prejudicial midtrial publicity requiring a mistrial. *See id.*

**{24}** Having concluded that there was no inherent prejudice under the analysis of either *Torres* or *Holly*, the trial court did not err in refusing to conduct individual voir dire interviews of the alternate jurors. *Holly*, 2009-NMSC-004, ¶ 22 ("Only when mid-trial publicity presents a serious possibility of prejudice, does voir dire become mandatory."). We conclude that the trial court did not abuse its discretion in either denying Defendant's motion for mistrial or motion to interview individual alternate jurors.

**B.      There was no fundamental error when prospective jurors saw Defendant under the supervision of uniformed detention officers**

**{25}** Defendant next argues that the trial court should have sua sponte ordered a mistrial when it became aware that certain jurors may have observed Defendant in the presence of uniformed detention officers. Before the jury was selected, prospective jurors allegedly saw uniformed detention officers hovering near Defendant. Defendant had asked that the courtroom be cleared of prospective jurors during his escort into the courtroom, and that detention officers remained seated apart from Defendant while any jurors were in the courtroom. At one point, though, some prospective jurors

observed uniformed detention officers near Defendant in the courtroom. Defendant was not shackled, and was wearing a white shirt with dark pants.

{26} When defense counsel realized that some of the prospective jurors had observed Defendant in the presence of the uniformed detention officers he promptly brought the issue to the attention of the trial court. Defense counsel, though, did not request a mistrial and instead the trial court and prosecutor worked with defense counsel to make sure the procedure was followed thereafter. None of the prospective jurors that saw Defendant on this occasion were ultimately selected for the jury panel that convicted Defendant.

{27} In addition to addressing whether midtrial publicity is inherently prejudicial, this Court in *Holly* also addressed whether fundamental error occurred where jurors may have observed a defendant in shackles and defense counsel chose not to move for a mistrial but instead tendered a general jury instruction. 2009-NMSC-004, ¶¶ 40-41. In this case, because defense counsel did not request a mistrial on this basis, and the trial court and prosecutor made subsequent efforts to ensure that Defendant was not in close proximity with uniformed detention officers, and perhaps more importantly because none of the selected jurors had observed Defendant with the uniformed detention officers, we review for fundamental error. *See id.*

{28} Fundamental error occurs where a conviction represents a miscarriage of justice because "(1) the defendant is indisputably innocent, or (2) a mistake in the process makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused." *State v. Astorga*, 2015-NMSC-007, ¶ 14, 343 P.3d 1245 (internal quotation marks and citation omitted). Defendant argues that the trial court should have sua sponte declared a mistrial after potential jurors saw him in the presence of uniformed detention officers because such a sight is so prejudicial that it constitutes fundamental error. We disagree, and conclude that there was no fundamental error.

{29} While Defendant is correct in his assertion that visible shackling is inherently prejudicial to Defendant's right to be presumed innocent, *Deck v. Missouri*, 544 U.S. 622, 630 (2005), where a single juror may have seen a defendant in handcuffs, this Court held that the defendant was not unfairly prejudiced. *Holly*, 2009-NMSC-004, ¶¶ 40-41. Consistent with that holding we conclude that, where potential jurors who did not ultimately decide Defendant's fate observed uniformed detention officers in Defendant's presence, there was no prejudice to Defendant. *See id.* Thus, no fundamental error occurred.

**C.    There was sufficient evidence of deliberate intent to support a rational jury's verdict of first-degree murder**

{30} Defendant also challenges the sufficiency of the evidence regarding his

17

identification as Victim's killer and the existence of deliberate intent. We conclude that the State presented sufficient evidence to prove both Defendant's identity as the killer and his deliberate intent to commit murder.

{31} "Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). "Deliberate intention" is intention "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." *State v. Cunningham*, 2000-NMSC-009, ¶ 25, 128 N.M. 711, 998 P.2d 176 (quoting UJI 14-201 NMRA). "Though deliberate intent requires a calculated judgment to kill, the weighing required for deliberate intent may be arrived at in a short period of time." *State v. Guerra*, 2012-NMSC-027, ¶ 28, 284 P.3d 1076 (internal quotation marks and citation omitted).

{32} "Evidence is sufficient to sustain a conviction when there exists substantial evidence of a direct or circumstantial nature to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Smith*, 2016-NMSC-007, ¶ 19, ___ P.3d ___ (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30,

278 P.3d 532. "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted).

{33} We first address the sufficiency of the evidence that Defendant was the person who committed this murder. The jury could have reasonably inferred that Defendant was the murderer from the evidence that the killer's shoe prints were consistent with a pair of shoes Defendant owned at the time of the murder; that the tire prints, made by a product sold only at Sam's Club, were consistent with the tires Defendant purchased at a Sam's Club; and that Defendant's DNA was found on Victim's underwear. Considering all of the evidence in favor of the verdict, when viewed as a whole, a reasonable mind could have concluded that Defendant was the killer based upon those facts. *See State v. Rojo*, 1999-NMSC-001, ¶¶ 20-24, 126 N.M. 438, 971 P.2d 829. Additionally, Defendant's explanation as to how his DNA came to be on Victim's underwear is so implausible that it further supports a juror's inference of guilt. *See State v. Flores*, 2010-NMSC-002, ¶ 23, 147 N.M. 542, 226 P.3d 641 (explaining that "an attempt to deceive the police may prove consciousness of guilt") (internal quotation marks and citation omitted). Additionally, Defendant fled the

19

jurisdiction soon after Victim's body was found—and such evidence of flight strengthens the inference of guilt. *See id*. Thus, based upon the totality of the evidence presented at trial, a jury could have reasonably concluded that Defendant was the murderer.

{34} We turn next to the sufficiency of the evidence that Defendant acted with deliberate intent. "Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515. Substantial evidence of deliberation can include fleeing the scene, disposing of evidence, or concocting false alibis. *Flores*, 2010-NMSC-002, ¶ 22. It can also include overkill, like shooting postmortem or inflicting a large number of stab wounds, killing a victim over a prolonged period of time, or pursuing a victim that evades capture. *Smith*, 2016-NMSC-007, ¶¶ 20-23 (collecting cases, and finding deliberate intent where the defendant stabbed his former girlfriend ninety times); *Guerra*, 2012-NMSC-027, ¶ 29 (concluding that a defendant who rendered the victim defenseless and then proceeded to stab the victim thirteen times was overkill sufficient to establish deliberate intent); *Flores*, 2010-NMSC-002, ¶ 22 (determining that a factor supporting deliberate intent was proof the defendant stabbed the victim "so many times that it evidenced an effort

20

at overkill").

{35} Defendant stabbed Victim fifty-six times, and also inflicted various other abrasions and incise wounds. The extent of these injuries, and the prolonged nature of the struggle, supports a rational jury's inference that Defendant killed with deliberate intent. *See Smith*, 2016-NMSC-007, ¶¶ 22-23; *Guerra*, 2012-NMSC-027, ¶ 29; *Flores*, 2010-NMSC-002, ¶¶ 11, 22. As well, Defendant fled the scene, and later concocted an implausible explanation as to the presence of his DNA on Victim's underwear, suggesting both consciousness of guilt and deliberate intent. *See Smith*, 2016-NMSC-007, ¶¶ 22-23*; Flores*, 2010-NMSC-002, ¶¶ 22-23. We conclude that there was sufficient evidence to support Defendant's conviction of first-degree murder, and we affirm the trial court.

**III.   CONCLUSION**

{36} In conclusion, the brief reference to Patty Simon was not inherently prejudicial and did not otherwise result in an unfair trial. As such, the trial court did not err in denying Defendant's motions for a mistrial and to interview alternate jurors to gauge the reference's impact on the jury. There was also no fundamental error by the trial court in failing to declare a mistrial after prospective jurors, who were not ultimately empaneled, observed uniformed detention officers with Defendant. Lastly, sufficient

21

evidence was presented to support Defendant's conviction for first-degree murder. For the foregoing reasons, we affirm Defendant's conviction.

{37}     **IT IS SO ORDERED.**

_____
**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**JUDITH K. NAKAMURA, Justice**

_____
**FREDDIE J. ROMERO, Judge**
**Sitting by designation**