42 P.(2d) 770

**STATE v. COYLE.**

No. 4005.

Supreme Court of New Mexico.

March 6, 1935.

Rehearing Denied April 8, 1935.

Theodore E. Jones, of Albuquerque, for appellant.

E. K. Neumann, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for the State.

WATSON, Justice.

Ray Coyle appeals from a conviction of murder in the first degree and the resulting capital sentence.

The verdict probably reflects a determination by the jury that this homicide by shooting was committed while appellant was attempting to perpetrate a felony—robbery while armed with a deadly weapon. It surely discloses a rejection of appellant's claim of self-defense. Of the instructions we have heard no complaint.

The first point claims error in the admission of this confession, which appellant admits he wrote and signed: "I came to Albuquerque had no money I looked around and in the evening about eight o'clock I held up a filling station and (interlined: 'got about $35.00') next I went to a fruit store to hold him up. I went in and to told the two men in there to put up there hands and give me the money, one of the men said I am not afraid of you and picked up a box to throw at me and I got rattled and shot to scare him but I hit him. I ran out of the store up to broadway st and then crossed the viadect and then went to my room put my gun in the water box in the bath room."

The objection urged is that the state failed to lay a proper foundation.

When it appeared at the trial that the state proposed to use the confession, the court caused the jury to retire and proceeded to an inquisition as to the competency of the confession. The state produced Mayor Tingley and Chief of Police O'Grady, who were present with the district attorney when the confession was written out. Both testified that no promises or threats were made to their knowledge or in their presence. It is fairly to be gathered from the testimony of both that appellant acquiesced in a statement made by the district attorney that appellant desired to make a statement and that it was to be made without promise or threat. Mayor Tingley testified further that appellant had just previously asked the district attorney "if any leniency could be had," and that the answer was that there could be none, or at least no assurance of any. We take it also that appellant had before that broached the matter of leniency to the mayor and had been merely referred to the district attorney.

It is not claimed that this showing was insufficient as a foundation. It appeared, however, that a number of other persons were

present, in and out at times, during or preceding the writing of the confession. It was objected, and is now urged, that the prosecution could meet the burden upon it only by producing or accounting for those others, who presumably would know something of the circumstances.

This is pressed upon us as a general principle, on the authority of three Illinois decisions, the cases of People v. Rogers, 303 Ill. 578, 136 N. E. 470; People v. Sweeney, 304 Ill. 502, 136 N. E. 687, and People v. Cope, 345 Ill. 278, 178 N. E. 95. These cases were unusual in their facts. We find in them no support for appellant's position.

Appellant, of course, had the right to rebut this prima facie showing by himself or by others. He chose not to do this. He stood upon the showing made. The court was put to it to rule upon the facts adduced by the state and upon the legal objection made by appellant. The former we deem sufficient; the latter we think unsound. So we find no error.

■ That appellant suffered no prejudice from the position taken by the able counsel who represented him by designation of the court is quite plain from the subsequent record. He testified in his own behalf and gave his own account of the circumstances attending the confession.

Under examination by his counsel, referring to a conversation with Mayor Tingley, in the presence of two patrol officers, thirty or forty minutes before he came to write the confession, he said: "I asked him if he thought I would get any leniency if I would write out a confession, I say 'although I am not admitting my guilt.' He said 'I don't blame you for that,' he said 'but I believe if you did the thing and you wrote out a confession that you would get leniency.'"

In his cross-examination we find this:

"Q. Now, let's get to the confession. This is your handwriting, isn't it? A. I believe it is, yes.

"Q. Signed Ray Coyle? A. Ray Coyle.

"Q. You wrote that yourself? A. Yes.

"Q. You were there at the police station when this was written? A. Yes.

"Q. Do you remember me being called down there? A. I most certainly do.

"Q. After you had been talking with Mayor Tingley? A. Yes.

"Q. Of course I don't know what you and Mayor Tingley talked about but when I got there what time of night was it, do you know? A. Well, I don't know, somewhere between ten and eleven, I should judge, might have been a little bit earlier.

"Q. You hadn't written this yet? A. No sir.

"Q. You had been talking to them? A. I hadn't told them nothing.

"Q. You told them something that afternoon? A. I didn't tell them a thing.

"Q. You didn't give up anything yet? A. No, I didn't.

"Q. Then you asked me if you would tell the whole story whether I would recommend a life sentence for you? A. Yes I did.

"Q. Is that true? A. Yes.

"Q. What did I tell you, Ray? A. Well, sir, I couldn't say the words you said, you didn't speak distinctly, you kind of mumbled, I don't know what you said.

"Q. Didn't you hear a thing I said, Ray? A. I couldn't understand what you said. * * *

"A. The first word you spoke when you came into the room, Mr. Tingley, or whatever his name may be, he asked you if you thought I would get off with a little leniency, and you said 'No, Clyde, I can't make any definite statements,' and that was the only words I could understand concerning the matter.

"Q. Was it Clyde asked me or did you ask me? A. Mr. Tingley asked you.

"Q. And beyond that you didn't hear me say anything? A. No, sir, you didn't state anything definitely.

"Q. Did we treat you all right there, Ray? Did anybody mistreat you? A. Not that I know of, they didn't.

"Q. Did I mistreat you? A. No."

If at the preliminary inquiry appellant had testified exactly as he did later, and had been corroborated by both patrol officers, we cannot doubt that the confession would have been admitted just as it was. There was no substantial ground for a claim that this man, wise in the ways of crime, confessed from any reasonable expectation of leniency in prosecution.

■ It is next contended that the state failed in proof of the corpus delicti; the particular claim being that there is no evidence that the death of the deceased was caused by the shot fired by appellant.

The shooting was admitted by appellant, who saw the deceased fall. An eyewitness says that the deceased was shot "right dead"; says that he fell "on the floor dead"; that he said "not a word." A witness who heard the shot and came at once found the deceased still alive and gave these answers:

"Q. Was he dead or alive? A. He was still alive when I got there.

"Q. Was he breathing? A. You couldn't see, his eyes was closed, in a minute or two he opened his mouth and slumped back.

"Q. He died while you were there then? A. Yes.

"Q. That was immediately after the shooting? A. Yes."

The bullet entered "about two and a half inches below the anterior wall of the axilla, it passed directly through the body, fractured the sixth rib, and then deflected upwards about three inches and was lodged immediately below the skin."

Inadvertently, no doubt, the prosecutor failed to obtain the opinion of the autopsy surgeon as to the cause of death, and this alone apparently has suggested the point. We think the fact may be arrived at from circumstantial evidence, and cannot doubt that the circumstances stated warranted the inference.

■ The theory of attempted robbery finds its main support in the testimony of an eye-

witness. Relying on physical facts, including the point of entry and course of the bullet, and the position in which the body lay, appellant contends it to have been conclusively demonstrated that the version of the eyewitness is false, and claims further that his own version of the encounter is strongly corroborated. On this premise he argues that the testimony of the state's witness is so inherently improbable as to be unworthy of belief, and invokes State v. Armijo, 35 N. M. 533, 2 P.(2d) 1075.

We find in this no sufficient ground to reverse the judgment or seriously to question the verdict. In a scene so rapidly shifting, one could scarcely be expected to describe positions as if the actors were posed. It may be that at the instant when postures and positions were photographed on the witness' brain, it would have been impossible for the bullet from appellant's gun to hit the deceased where it did hit him, or to follow the course it did follow. That is not conclusive against the essential truth of the witness' story. The question was for the jury, and we have no reason to believe that it was imposed upon.

The state was permitted to introduce certain bullets. If all the errors claimed in that connection were to be admitted, we fail to note how appellant can have been prejudiced. As a witness, he admitted shooting the deceased. None of the evidence here in question could have influenced the jury in deciding the issue of self-defense.

Having found no error, we necessarily affirm the judgment. It remains for this court to direct execution of the sentence pronounced. A date therefor will be appointed by order in due course.

It is so ordered.

SADLER, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.