43 P.(2d) 933

**STATE v. WICKMAN.**

No. 4036.

Supreme Court of New Mexico.

April 8, 1935.

W. A. Brophy and Owen B. Marron, both of Albuquerque, for appellant.

E. K. Neumann, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for the State.

WATSON, Justice.

Carl Wickman, convicted of murder in the first degree, appeals from the resulting capital sentence.

The count of the information which went to the jury charged that the killing was effected by striking the deceased with a heavy weapon.

On the evening of the homicide state's witnesses, driving north on the Albuquerque-Santa Fé Highway, were stopped by appellant about ten miles north of Albuquerque. Appellant's car was partly on and partly off the pavement, headed south toward Albuquerque. The deceased, appellant's wife, was lying on the pavement some feet ahead of the car, dead or practically so.

Appellant then claimed that he and his wife had been driving toward Albuquerque, the deceased at the wheel; that the steering apparatus had broken; that both alighted, deceased on the left, appellant on the right; that on coming around to the left side of the car, he found the deceased lying on the pavement, evidently having been struck by a passing car.

A week later, a written statement was made by appellant which the state introduced in evidence. He there admitted killing the deceased, saying that as she stooped to look under the car he struck her on the head with an iron. The confession runs thus:

"I Carl Wickman deem this to be my true confession. Saturday noon Nov. 25th I came home and told my wife Donalda that I had deceived her in every way  Explaining that we had no money at all  That buying a business was a myth  All was a wild fancy in my brain  She cried but did not reproach me too much  We talked about it for a little while in which time I felt smaller and smaller. Presently she stood up where I was and kissed me and swore she would stand by me and see it through.  Her bigness of heart was too big for me  I felt like I was not fit to live I had resolved to commit suicide  I didn't tell her that  She must have understood She suggested that we eat early and go to town and obtain work  We passed the Church and went in and prayed  Saw Mr. Johnstone of the Salvation Army and he told me to go and live with them Monday

"We felt mighty blue and I felt guilty as Hell.  We went to Church and I confessed to Father Walsh my intentions of suicide and other sins  That evening we decided to take a little drive  We left about 7:30 and drove North through Alameda  I don't know how to say it but thoughts of suicide ran through my mind and the advice Father gave me  That was terrible  I got past Alameda and turned off into the cottonwood trees and I went about 200 yards, and there turned around and stopped.  I talked with my wife and confessed what I had done and she forgave and kissed me  Then we left and pulled out into the highway and went north towards Berna-

lillo a couple of miles and turned around and drove back toward Alameda driving slowly I was in a daze I knew what was going on and then I didn't. I remember her saying something is wrong with the wheels and we stopped I got out of the car on the right side with the Iron in my hand. I was looking at the front wheel to see if it was flat and looked under the car and saw the steering wheel dropped. My wife Donalda was out of the car She stooped down to look under the car and I hit her one blow on the head with the Iron and she staggered a few steps down the road and fell forward. I swayed back against the fender and dropped the rod on the running board then I ran forward. She was laying on her side face down The coat was there I dont know what I did with it I put it underneath her head I dont know how long I was there talking to her A car didnt come for some few minutes. I knew something terrible had happened I did not know until tonight what it was or how it had happened All I remember was seeing her lying on the pavement. There was no abuse or promises in obtaining this confession."

It was the theory of the state that appellant had long planned the killing; that he had procured numerous policies of accident insurance upon her life, and that his motive was to realize upon them.

Appellant did not testify in his own behalf, and the only witness for the defense was a surgeon who performed the autopsy, by whom it was attempted to show at least a possibility that the deceased had been hit and killed by a passing automobile.

The admission of the confession was resisted and is here complained of. But first it is contended that the court erred in refusing to permit the jury to consider any offense other than murder in the first degree. It is claimed that murder in the second degree and voluntary manslaughter should have been submitted.

The principles here involved have been discussed in Torres v. State, 39 N. M. 191, 43 P.(2d) 929, an opinion handed down with this Little need be added to what is there said. We have but to apply those principles to this case.

In State v. Reed et al., 39 N. M. 44, 39 P.(2d) 1005, an opinion was pressed that any homicide amounting to murder must contain within its circumstances a set of facts constituting murder in the second degree. The majority admitted the truth of this "in the ordinary homicide case," but denied its applicability in that case. Because of the statute, we could not uphold a verdict which said that the defendants had committed a malicious homicide by means of torture and were guilty of murder in the second degree. We had just previously held similarly as to a verdict which said that one who had committed a murder (homicide) in the perpetration of a felony was guilty of murder in the second degree. State v. Welch, 37 N. M. 549, 25 P.(2d) 211. Not only are those forms of murder readily identifiable; they had been actually identified by the verdicts in those cases.

Those cases do not answer the question whether in any other class of homicide the state of mind of the slayer, as to the quality

or grade of his malice, may be so laid bare by evidence as to permit the judge to declare it as matter of law. That question did not arise in Torres v. State, supra. In that case we were compelled to hold that the circumstances were susceptible of more than one construction. In such a case the choice is admittedly for the jury.

In the case at bar the judge necessarily held that the evidence disclosed a killing, not merely premeditated in the legal sense, "thought of beforehand," but deliberate in the legal sense, after "a thinking over with calm and reflective mind" or from a "fixed and settled deliberation and coolness of mind."

We have no purpose to insist upon these particular definitions, though they come from the highest authority. In the case at bar the judge instructed: " 'Deliberate' may be defined as not suddenly and after the mind has weighed all the matters presented to it." Let us determine the matter according to that standard.

We take it that if an accused slayer should testify in his own behalf that he committed the homicide upon a sudden impulse, without having planned or sought the encounter, and without having considered the consequences, it would raise a question of fact as to his state of mind, no matter how strongly other evidence might suggest that the killing had been deliberately planned for the basest purpose. How does the case at bar differ from such a case?

The state introduced res gestæ statements of appellant, in which he claimed that the deceased was killed by a passing automobile. It also introduced the confession, in which appellant admitted that he killed the deceased with a heavy iron. He did not confess that he killed her, *not suddenly, and after his mind had weighed all the matters presented to it*. The one thing that stands out in this incoherent statement is in effect a denial of having weighed matters, a denial of the state's theory of law and fact. What appellant had been weighing was suicide. The impulse to slay came upon him suddenly with the opportunity, and he acted upon it.

Lame as this claim of mitigation is likely to seem in the eyes of the jury, we do not see how the judge can take it from the jury's consideration. If it is true, the crime was murder in the second degree. The jury could accept such part of this confession as it believed, and reject the rest. The judge could reject none of it.

It follows that appellant has not had that chance for his life which the law gives him, and must have a new trial.

Other contentions of error will be mentioned only in so far as seems advisable in contemplation of another trial of the case.

In this record, as in the Torres record, we find no evidence of voluntary manslaughter, and no error in refusing to submit that theory of the homicide.

Two points are made as to the confession: That the court admitted it "before the corpus delicti had been proven by independent evidence;" and that the court erred in admitting it because not voluntarily made.

It seems to be assumed by the able counsel who serve appellant by designation of the court that the general principle of criminal law that the corpus delicti cannot be made out by the extrajudicial confession requires that the corpus delicti be proven before admission of the confession. And trial judges generally so regulate the matter. But if the state's case as finally submitted contains sufficient independent proof that the crime charged has been committed by some one, it is not our understanding that the mere order of proof is matter for inquiry and regulation here. None of the authorities cited so indicate. That the necessary proof of the corpus delicti was finally made, we think tacitly admitted. We are not impressed that there is merit in this first point of attack upon the confession.

It appears that prior to the confession appellant was detained in the Albuquerque city jail three or four days, and there subjected to rather persistent and long-continued questioning by officers in the effort to obtain the truth, the assumption always being that appellant killed his wife. This course of treatment, no doubt, interfered to an extent with appellant's opportunities for normal sleep. It is not claimed that any other physical pressure was brought to bear.

During this process Chief O'Grady told appellant, "If he done it, to tell the truth," or "It would be to his best interests to tell the truth." Officer Davis, who finally obtained the confession, asked by appellant what would happen to him, replied, "I don't know what will happen to you, but the best thing for you to do is to tell the truth." This officer's attention was not called to this particular incident. He says, however, that he told appellant "that if he would tell the truth about the whole thing, how it happened, he would feel better about it." After the substance of the confession had been communicated, but before it was written out, this officer told appellant "that he would feel better if he got this off his mind."

After the confession was signed, appellant appeared in good spirits and said "he was happy that it was all over." He told the district attorney at that time that "he was treated right," and that "he was not promised anything."

Two kinds of influence are relied upon in the argument that this was an involuntary confession: That appellant was harassed to a point where he may have made a false confession in order that he might be allowed to sleep; that he interpreted what the officers said as holding out some hope of leniency. We have no testimony by appellant himself as to whether his confession was voluntary or how he was in fact influenced to make it.

In so far as deprivation of sleep is relied upon, we consider that the case comes within the rule established in State v. Woo Dak San, 35 N. M. 105, 290 P. 322. Deprivation of sleep to the normal person is comparable to deprivation of a drug to the addict. A natural and necessary inference that the confession will afford the opportunity for sleep does not differ in principle from an actual promise of the drug. The boon, in the one case naturally anticipated and in the

other actually promised, is collateral. It has no reference to the punishment to follow.

The promise of a collateral boon does not ex proprio vigore render the confession involuntary in the legal sense. The question for the judge to determine is whether, under all the circumstances, the influence was strong enough to cause an innocent man to confess falsely. This puts heavy responsibility on the trial judge, since this court will not overturn his judgment merely because we might have decided differently. State v. Woo Dak San, supra.

As to promises of leniency, the rule is different. Here State v. Dena, 28 N. M. 479, 214 P. 583, 584, is strongly relied upon. It was there said that the law cannot measure the influence of express or implied promises of leniency made by any person in authority; so that if any such promise appears by uncontradicted evidence, it renders the confession inadmissible. We did not in that case align ourselves with either side of the judicially debated question, "whether the mere adjuration to tell the truth is sufficient to exclude the evidence of such confessions." For we considered that the sheriff's assurance to the defendants that they would not be hurt if they confessed distinguished the case.

In Woo Dak San's Case, supra, where all of our earlier decisions were weighed in conference, we intimated that when the occasion should require, it might be wise to consider some relaxation of the strict rule of exclusion. The occasion has arisen. For if mere adjurations to tell the truth—mere advice to tell the truth, or that it will be better to tell the truth—compel exclusion of the confession, this confession was erroneously admitted.

There is a slight, but important, distinction in the adjurations above recited. Where modified by the suggestion that appellant will feel better for telling the truth, or for getting the thing off his mind, there is really a negation of the idea that the confession will have a bearing on the punishment to follow. Such adjurations we consider fairly in a class with spiritual exhortations. If so, according to the text quoted with approval in Woo Dak San's Case, they should not be held of their own force to render the confession involuntary.

Where the suggestion is that "it will be better," or that "it will be to your best interests" to tell the truth, it is possible to argue that the accused may have inferred some promise going to the punishment for the crime, and to bring the case within the principle stated in Dena's Case, supra. It is apparent, however, that such a rule will render obtaining a confession a matter of the greatest delicacy, a matter too delicate to be intrusted to most peace officers.

Too much may easily be claimed for the Dena decision. The principle of law was stated strongly; the court did in fact hold that to be a case of implied promise of leniency; and it is difficult to distinguish in principle between a promise that one will not be hurt if he confess and a promise that it will be to his best interest to confess. Yet it was there given emphasis that the defendants were Indians, unable to speak the English

language, "who doubtless in this helpless condition relied largely upon such officer and his advice and assurance, that they would not be hurt."

If, in law, the implied promise, of its own force, rendered the confession involuntary, there was no logical reason for permitting those facts to intrude. On the other hand, if the real question for the judge to decide was whether any promise was reasonably to be implied in the particular case, the facts were highly important, and the decision might be different in the case of the ignorant Indian than in that of the experienced and educated citizen.

It may be well enough to say that the law will not undertake to measure the influence of any real promise going to the punishment. We consider it too much to say that the judge must imply a promise where none was probably intended, perceived, or relied upon. Conditions in this jurisdiction, so far as our knowledge goes, do not call for so drastic a rule of exclusion.

Appellant is an intelligent, educated man. To such a mind these adjurations carry no reasonable implication that leniency can or will be shown. After having confessed, he said that it was good to have it over, and admitted that he had been promised nothing. We consider that the state had sustained the burden of establishing the voluntary character of the confession. We are not saying that the judge may measure the influence of a promise made. We say that it was within his province to say in this case that no promise was made.

■ In State v. Coyle, 39 N. M. **151**, 42 P. (2d) 770, argued and decided during the present term, the point here decided was not raised. But in expressing satisfaction that Coyle was not prejudiced by his failure to give his version, we considered his claims subsequently made. Without going into the authorities, we reached substantially the conclusion we here reach. We shall make no attempt to formulate now, nor to say the last word. But we hold that adjurations such as these may be considered by the judge, in the light of the circumstances, to determine whether the accused could reasonably have inferred a promise going to the punishment for the crime to be confessed.

■ The question is here raised whether the state had satisfied its burden so long as some persons who were about more or less during the questioning process were not produced for examination. That question we ruled upon in the case of Coyle, supra. We here overrule the contention on that authority.

■ We are not impressed that there was error in the admission of the insurance policies.

The judgment must be reversed for the error in failing to submit the theory of murder in the second degree. The cause will be remanded for new trial.

It is so ordered.

SADLER, C. J., and BICKLEY and ZINN, JJ., concur.

HUDSPETH, J. (dissenting).

In my opinion the killing of his wife by appellant, in the manner and under the circumstances detailed in the confession and set out in the opinion of the court, if done by a sober, sane man, would constitute murder in the first degree. There was sufficient time for him to deliberate, between the picking up of the iron with which he struck the fatal blow, before leaving the car, and the time when his wife knelt for the purpose of looking under the car and received the blow. However, aside from this, it is held in other jurisdictions under statutes similar to ours that brutal murders of this type committed under similar circumstances offend against the first-degree murder statute. The Supreme Court of Missouri in State v. Duestrow, 137 Mo. 44, 38 S. W. 554, 566, 39 S. W. 266, said: "It is asserted that the court should have instructed the jury on murder in the second degree. We are of a different opinion, and for several reasons: * * * An answer equally good to defendant's contention on this point is found in the circumstances of the homicidal act, which gave origin to the present prosecution. * * * It is well settled at common law, still in force in this state, that, when a homicide is committed in circumstances of great barbarity and cruelty, such brutal malignity will supply the place of malice, and make the act of killing equivalent to a deliberate act of slaughter,—murder at common law, and murder in the first degree under our statute."

The Supreme Court of Arkansas in Bell v. State, 120 Ark. 530, 180 S. W. 186, 187, 197, said: "Now, if the defendant was sane, it was manifest, from the enormity of the crime and the shocking manner of its perpetration, that he was guilty of murder in the first degree. The jury were told in this declaration of law that a perverted and a deranged mental condition, either partial or general, which rendered the defendant incapable of deliberating or premeditating as to the commission of the particular act, might not excuse him, but that the jury might find him guilty of murder in the second degree. The jury could have concluded that, if his perverted and deranged mental condition would not excuse him for murder in the second degree, it ought not to relieve him from responsibility for the higher and the only offense of which he could have been convicted under the evidence and the other instructions of the court. This part of the instruction was misleading, contradictory in itself, in conflict with other instructions, and highly prejudicial to the defendant. This part of the instruction, if it means anything, was doubtless an attempt to state the principle announced in the third test; but, if so, it was an incorrect statement of it, and well calculated to confuse the jury. Under the evidence it had no place in the case."

Appellant's confession, aside from the narration of events, was a plea of mental irresponsibility—insanity—closing with the following: "I knew something terrible had happened. I did not know until tonight what it was or how it happened."

Appellants' able counsel, no doubt wisely, decided that a plea of insanity would be

of no avail to their client, and relied upon the theory of accidental homicide.

The better doctrine is, I believe, that insanity does not reduce the crime from murder in the first degree to murder in the second degree. This seems to have been the rule of our territorial court. Territory v. Kennedy, 15 N. M. 556, 110 P. 854. In People v. Troche, 206 Cal. 35, 273 P. 767, 772, the Supreme Court of California held: "The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal in both degrees. State v. Maioni, 78 N. J. Law, 339, 74 A. 526, 528, 20 Ann. Cas. 204."

And in Commonwealth v. Hollinger, 190 Pa. 155, 42 A. 548, 549, the court quoted from United States v. Lee, 4 Mackey (15 D. C.) 489, 54 Am. Rep. 293, with approval, as follows: " 'It rests upon the idea that there is a grade of insanity not sufficient to acquit the party of the crime of manslaughter, but yet sufficient to acquit him of the crime of murder. The law does not recognize any such distinction as that in the forms of insanity. * * * ' "

To the same effect, see State v. Green, 78 Utah, 580, 6 P.(2d) 177, 184; Witty v. State, 75 Tex. Cr. R. 440, 171 S. W. 229, 238; State v. Kotovsky, 11 Mo. App. 584; United States v. Lee, 4 Mackey (15 D. C.) 489, 54 Am. Rep. 293; Commonwealth v. Scott, 14 Dist. & Co.

Rep. (Pa.) 191; and People v. Kelley, 7 Cal. App. 554, 95 P. 45.

I regret being obliged to differ from my learned colleagues, but for the reasons stated I dissent.