**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2017-NMSC-030**

**Filing Date: October 5, 2017**

**Docket No. S-1-SC-34839**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**BENJAMIN DAVID BAROZ III,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Jerry H. Ritter, Jr., District Judge**

Bennett J. Baur, Chief Public Defender
J. K. Theodosia Johnson, Assistant Appellant Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Tonya Noonan Herring, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

**I.**    **INTRODUCTION**

**{1}**    A jury convicted Benjamin David Baroz III (Defendant)[1] of felony murder based on

---

[1]While Defendant's full name is Benjamin David Baroz III, he was referred to as "David" during trial.

1

the predicate felony of shooting at or from a motor vehicle, two counts of aggravated assault with a deadly weapon, and possession of drug paraphernalia. The conviction of shooting at or from a motor vehicle was vacated on double jeopardy grounds. *See State v. Frazier*, 2007-NMSC-032, ¶ 1, 142 N.M. 120, 164 P.3d 1 (holding that the predicate felony is always subsumed into a felony murder conviction). Defendant appeals his convictions, arguing that he is entitled to a new trial because: (1) shooting at or from a motor vehicle cannot serve as a predicate felony for felony murder; (2) the evidence was insufficient to support a conviction of second-degree murder; (3) the district court erred in denying his request for a jury instruction on self-defense; (4) the one-year firearm enhancements on his sentences for aggravated assault with a deadly weapon violate double jeopardy; and (5) the State should not have been allowed to impeach his trial testimony with a statement obtained in violation of his *Miranda* rights.

**{2}**     We vacate Defendant's felony murder conviction and order that a conviction of second-degree murder be entered instead. We affirm the district court's holdings that (1) Defendant was not entitled to a self-defense instruction; (2) the imposition of a one-year firearm enhancement on an aggravated assault with a deadly weapon conviction does not violate double jeopardy; and (3) the statements Defendant made after invoking his right to remain silent were voluntary and could be used for impeachment.

## II.     BACKGROUND

**{3}**     On August 30, 2011, in Alamogordo, New Mexico, Defendant's father drove his truck past Vangie Cordova's house, where she lived with her grandsons, Matthew Cordova and Daniel Cordova, with Defendant in the passenger seat. The truck passed the house at least once, went around the block, and came back again, very slowly, with the windows partially rolled down. Matthew Cordova, Daniel Cordova, and a friend were in the backyard. At that point, multiple shots were fired from the passenger side window of the truck into the yard, hitting and ultimately killing Matthew Cordova (Victim).

**{4}**     The State presented the theory that Defendant fired the gun that killed Victim. Defendant claimed that his father was responsible, and that Defendant did not know that or intend for the shooting to occur. Additional facts are provided below as necessary for the analysis.

## III.     DISCUSSION

### A.     Felony Murder Conviction

**{5}**     Defendant contends that shooting at or from a motor vehicle cannot serve as the underlying felony sustaining a felony murder conviction. *See* NMSA 1978, § 30-2-1(A)(2) (1994); NMSA 1978, § 30-3-8(B) (1993). We agree.

**{6}**     We clarified in *State v. Marquez* that "shooting at or from a motor vehicle is an

2

elevated form of aggravated battery, and thus cannot be used as a predicate for felony murder." 2016-NMSC-025, ¶ 23, 376 P.3d 815 (internal quotation marks and citations omitted). In *Marquez*, the defendant was convicted of first-degree felony murder predicated on the underlying felony of shooting at or from a motor vehicle. *Id.* ¶ 1. Like the defendant in *Marquez*, the underlying felony supporting Defendant's felony murder conviction was the felony of shooting at or from a motor vehicle. Thus, Defendant's use of a motor vehicle to commit the killing does not automatically elevate his crime of second-degree murder to first-degree murder. Because shooting at or from a motor vehicle cannot serve as the predicate to felony murder, we vacate Defendant's conviction of felony murder and order that a conviction of second-degree murder should be entered instead.

**B.      Sufficiency of the Evidence for a Second-Degree Murder Conviction**

**{7}**      Next, we address whether there was sufficient evidence presented at trial to support a conviction of second-degree murder. *See State v. Meadors*, 1995-NMSC-073, ¶¶ 1, 45, 121 N.M. 38, 908 P.2d 731 (upholding a defendant's conviction of a lesser included offense); *see also* § 30-2-1(B) (defining second-degree murder as a lesser included offense of first-degree murder). Defendant contends that the evidence presented at trial was insufficient to support a conviction of second-degree murder. Defendant argues that his father was the actual perpetrator of the killing and Defendant did not know that or intend for anyone to be killed that day.

**{8}**      Although Defendant was not indicted for second-degree murder, he was on notice to defend against it because it is a lesser included offense of first-degree murder. *See State v. Hernandez*, 1999-NMCA-105, ¶¶ 25-28, 127 N.M. 769, 987 P.2d 1156 (determining whether an offense was a lesser included offense when a court considers a charge sua sponte). Second-degree murder is a lesser included offense of felony murder from a strict elements standpoint because a defendant cannot commit the greater charge without also committing the lesser: all of the elements necessary to prove second-degree murder are also necessary to prove felony murder. *See Hernandez*, 1999-NMCA-105, ¶ 25. Because Defendant was on notice to defend against second-degree murder based on the elements of the crime charged, we need not consider the pleadings or the evidence presented at trial. *Id.* ¶ 26 ("The test aims to avoid the inflexibility of the strict elements test while providing notice to the defendant of the crime against which he must defend." (citation omitted)); *see also Meadors*, 1995-NMSC-073, ¶ 12 (listing additional factors for determining whether a crime is a lesser included offense). In this case, by convicting Defendant of felony murder, the jury convicted Defendant of each of the elements necessary to prove second-degree murder.

**{9}**      "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate

3

to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). "In reviewing whether there was sufficient evidence to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *Id.* (internal quotation marks and citation omitted). "The jury is free to reject [the d]efendant's version of the facts." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citations omitted).

**{10}** To support a conviction of second-degree murder, the State had to prove beyond a reasonable doubt that Defendant killed Victim and knew that his acts created a strong probability of death or great bodily harm to Victim or any other human being. *See* Section 30-3-8(B). At trial, the jury heard evidence that Defendant was in the passenger seat when his father drove past the Cordova residence. Daniel Cordova testified that he saw the "muzzle flash" from shots fired from the passenger side window of the truck. He also testified that, after the shots were fired, he saw his cousin, Victim, lying on the ground. Dr. Michelle Aurelius testified at trial that Victim died from the gunshot wound. Because Defendant was in the passenger seat and the shots were fired out of the passenger side window, a jury could reasonably conclude that Defendant was the shooter. Based on the testimony that the shots fired resulted in Victim's death, we conclude there was sufficient evidence for a jury to find beyond a reasonable doubt that Defendant killed Victim.

**{11}** We now turn to Defendant's mens rea. To be guilty of second-degree murder, Defendant must have had knowledge that his acts created a strong probability of death or great bodily harm. *State v. Ortega*, 1991-NMSC-084, ¶ 25, 112 N.M. 554, 817 P.2d 1196, *abrogated on other grounds as recognized by State v. Suazo*, 2017-NMSC-011, ¶ 23, 390 P.3d 674. Defendant testified that there were five or six people in the yard when he passed by in the truck. On cross-examination, Defendant admitted that he knew that shooting in the direction of a group of people in a residential area presented a danger to human life. If the jury determined that Defendant was the shooter, it would be reasonable to conclude that he "knew that his acts created a strong probability of death or great bodily harm to [Victim] or any other human being." Accordingly, the evidence was sufficient to support a conviction of second-degree murder or felony murder. *See State v. Campos*, 1996-NMSC-043, ¶ 29, 122 N.M. 148, 921 P.2d 1266 ("[I]n order for the felony murder doctrine to apply to a defendant, the State must prove that the defendant acted with the mens rea for at least second-degree murder.").

## C.    Self-Defense Instruction

**{12}** We next address whether the district court erred by refusing Defendant's requested self-defense instruction for murder, felony murder, and the aggravated assaults. The district court denied the self-defense instruction, reasoning that "seeing someone approaching, even in an angry manner, with an arm behind the back is insufficient as a matter of law to justify deadly force." Defendant preserved this issue by requesting the self-defense instruction and presenting his argument concerning that instruction in the district court.

**{13}** "The propriety of denying a jury instruction is a mixed question of law and fact that we review de novo." *State v. Gaines*, 2001-NMSC-036, ¶ 4, 131 N.M. 347, 36 P.3d 438. "When, as in this case, a challenge to the jury instructions has been preserved, we review for reversible error." *State v. Ellis*, 2008-NMSC-032, ¶ 14, 144 N.M. 253, 186 P.3d 245. "Failure to instruct on self-defense when there is a sufficient quantum of proof to warrant it is reversible error." *Gaines*, 2001-NMSC-036, ¶ 4. "We do not weigh the evidence but rather determine whether there is sufficient evidence to raise a reasonable doubt about self-defense." *Id*.

**{14}** A defendant is only entitled to jury instructions on a self-defense theory if there is evidence presented to support every element of that theory. *State v. Gonzales*, 2007-NMSC-059, ¶ 19, 143 N.M. 25, 172 P.3d 162. "An instruction on self-defense requires evidence that (1) the defendant was put in fear by an apparent danger of immediate death or great bodily harm, (2) the killing resulted from that fear, and (3) the defendant acted reasonably when he or she killed." *Id.* ¶ 20 (internal quotation marks and citation omitted). We have described the first two requirements as "subjective in that they focus on the perception of the defendant at the time of the incident." *State v. Coffin*, 1999-NMSC-038, ¶ 15, 128 N.M. 192, 991 P.2d 477. In contrast, "the third requirement is objective in that it focuses on the hypothetical behavior of a reasonable person acting under the same circumstances as the defendant." *Id.*

**{15}** Where there is "enough evidence to raise a reasonable doubt in the mind of a juror about whether the defendant lawfully acted in self-defense [such that] . . . reasonable minds could differ, the instruction should be given." *State v. Rudolfo*, 2008-NMSC-036, ¶ 27, 144 N.M. 305, 187 P.3d 170 (citation omitted). "When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instruction[s]." *State v. Swick*, 2012-NMSC-018, ¶ 60, 279 P.3d 747 (alteration in original) (internal quotation marks and citation omitted). For the reasons that follow, we conclude that Defendant did not act reasonably when he killed Victim and the district court did not err in refusing a self-defense instruction.

**{16}** Defendant argues that he was entitled to the self-defense instruction based on his testimony that when he and his father approached the Cordova residence in their truck, some people moved toward the truck with their hands behind their backs, leading Defendant to believe that they were armed and going to attack. Additionally, Defendant highlights Daniel Cordova's testimony that the friend in Cordova's yard always carried a gun and that Victim was behaving in a threatening manner.

**{17}** The circumstances of this case do not meet the standard of objective reasonableness necessary for a self-defense instruction. First, "the law of self-defense does not imply the right to attack, nor will it permit acts done in retaliation for revenge . . . ." *State v. Pruett*, 1918-NMSC-062, ¶ 9, 24 N.M. 68, 172 P. 1044. Daniel Cordova testified that Defendant provoked the situation when Defendant and his father drove to the Cordova residence and shouted, "Southside!" Victim and others in the backyard then approached the truck. Because

5

Defendant voluntarily entered into the situation, he cannot avail himself of the law of self-defense.

**{18}**     Additionally, it was not reasonable for Defendant to have used deadly force. *See State v. Sutphin*, 2007-NMSC-045, ¶¶ 23-24, 142 N.M. 191, 164 P.3d 72 (holding that a self-defense instruction is not appropriate where the victim threatened the defendant with a pipe and the defendant responded by repeatedly striking the victim with the pipe even after the victim lost consciousness); *Gaines*, 2001-NMSC-036, ¶ 10 (concluding that a self-defense instruction was not warranted where the victim allegedly had a knife but dropped it "well before the altercation" with the defendant); *State v. Lopez*, 2000-NMSC-003, ¶¶ 24-26, 128 N.M. 410, 993 P.2d 727 (holding that a self-defense instruction was not warranted where the victim pulled a knife on the defendant during a fight and the defendant responded by stabbing the victim fifty-four times and crushing his skull); *but see State v. Parish*, 1994-NMSC-073, ¶¶ 2, 5, 118 N.M. 39, 878 P.2d 988 (concluding that a self-defense instruction was appropriate when the defendant was tackled and beaten by multiple assailants and ultimately ended the fight by pulling a gun and shooting and killing one of them). While there was some violent history between Defendant and Victim, their fight occurred approximately a year before this shooting. Defendant did not claim that he saw any weapons, nor did he claim to know that anyone at the Cordova residence carried guns. Although Defendant claimed he saw Victim reach behind his back as if he were going to pull out a gun, Defendant did not testify to anything that would support an inference that anyone else had a gun. Defendant and his father had the additional benefit of being inside the truck, which would have offered protection if Victim had a gun, and provided the means for a swift escape if the situation had escalated.

**{19}**     Where "the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind on whether a defendant . . . did act in self-defense," the instruction should not be given. *Sutphin*, 2007-NMSC-045, ¶ 22 (omission in original) (internal quotation marks and citation omitted). Because we do not find evidence on which reasonable minds could differ as to the objective element of self-defense in Defendant's case, we conclude that the district court did not err in rejecting his self-defense instruction. We affirm on this issue.

**D.     Double Jeopardy and the Imposition of a One-Year Firearm Enhancement**

**{20}**     Defendant was sentenced to a term of eighteen months, followed by one year of parole, for each of his convictions of aggravated assault with a deadly weapon. *See* NMSA 1978, § 30-3-2(A) (1963). Pursuant to NMSA 1978, Section 31-18-16(A) (1993), the firearm enhancement statute, Defendant's sentences on these counts were each enhanced by one year. Defendant contends that the firearm enhancement violates double jeopardy because use of a firearm is an element of the underlying crime, aggravated assault with a deadly weapon. We disagree.

**{21}**     The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution protects against multiple punishments for the same offense. *Witte v. United*

*States*, 515 U.S. 389, 395-96 (1995). There are two variations of multiple-punishments cases: (1) unit of prosecution cases, in which an individual is convicted of multiple violations of the same criminal statute; and (2) double description cases, in which the same criminal act is punished under two distinct statutes. *Swafford v. State*, 1991-NMSC-043, ¶¶ 25, 30, 112 N.M. 3, 810 P.2d 1223. Defendant's arguments, involving separate statutes, raise only double description concerns. The protection against multiple punishments is designed to ensure that sentencing discretion is confined to the limits established by the legislature. *See Garrett v. United States*, 471 U.S. 773, 793 (1985); *Ohio v. Johnson*, 467 U.S. 493, 499 (1984); *Brown v. Ohio*, 432 U.S. 161, 165 (1977).

**{22}** We employ a two-step inquiry to review double description claims. We first determine "whether the conduct underlying the offense is unitary, i.e., whether the same conduct violates both statutes." *Swafford*, 1991-NMSC-043, ¶ 25 (emphasis omitted). Only if the conduct is unitary do we proceed to the second step—to determine whether the legislature intended to create separately punishable offenses. *State v. Carrasco*, 1997-NMSC-047, ¶¶ 22-23, 124 N.M. 64, 946 P.2d 1075. If the statutes do not expressly provide for multiple punishments, we determine whether the legislature intended to authorize multiple punishments for the same offense by applying the rule of statutory construction commonly referred to as the "same elements test." *See Blockburger v. United States*, 284 U.S. 299, 304 (1932) (articulating the test, which asks whether either provision requires proof of a fact which the other does not, to determine whether crimes are indeed separate and whether cumulative punishment may be imposed); *see also State v. Gonzales*, 1997-NMCA-039, ¶ 17, 123 N.M. 337, 940 P.2d 185 (using the term "same elements test").

**{23}** This case involves a unitary act because the act underlying the aggravated assault and the firearm enhancements, Defendant's firing a gun, was one and the same. Defendant was convicted of aggravated assault, which made him eligible for a sentencing enhancement. As such, we must determine whether the Legislature intended to create separately punishable offenses.

**{24}** Legislative intent is an issue of law that is reviewed de novo. *State v. Montoya*, 2013-NMSC-020, ¶ 29, 306 P.3d 426. The ultimate goal is to facilitate and promote the Legislature's purpose. *Id.*

**{25}** Section 31-18-16(A) provides that a sentence shall be increased by one year when a court or jury makes a separate finding of fact that a firearm was used in the commission of a noncapital felony. Section 31-18-16(A) thereby authorizes multiple punishments for the commission of a noncapital felony with a firearm.

**{26}** The United States Supreme Court held that where "a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court[] . . . may impose cumulative punishment under such statutes in a single trial." *Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983). In *Swafford*, this Court noted that "[s]tatutes directed toward protecting

7

different social norms and achieving different policies can be viewed as separate and amenable to multiple punishments." 1991-NMSC-043, ¶ 32. "[U]nless unconstitutional, it is not the role of this Court to question the wisdom, policy or justness of legislation enacted by our [L]egislature." *State v. Maestas*, 2007-NMSC-001, ¶ 25, 140 N.M. 836, 149 P.3d 933.

**{27}** The legislative policy behind the firearm sentence enhancement is that a noncapital felony, committed with a firearm, should be subject to greater punishment than a noncapital felony committed without a firearm because it is more reprehensible.[2] The very nature of a firearm enhancement is to require the sentencing judge to increase or enhance the basic sentence that applies to the crime. By enacting the enhancement, the Legislature intended to authorize greater punishment for noncapital felonies committed with a firearm. We conclude the Legislature intended to authorize an enhanced punishment when a firearm is used in the commission of aggravated assault. The sentence enhancement does not run afoul of double jeopardy and thus, we affirm the district court's application of the sentence enhancement.

**E.      Statements Following Invocation of the Right to Remain Silent**

**{28}** Finally, we turn our attention to whether Defendant's statements to the detectives, which followed his invocation of the right to remain silent, were involuntary so as to render improper their admission as impeachment evidence.

**{29}**     Prior to trial, the parties agreed in a stipulated order that some of Defendant's statements provided to the police during an interview violated his right to remain silent, and were inadmissible. The detectives had continued to question Defendant after he invoked his *Miranda* rights. In its stipulated order, the district court also found that the statements taken before Defendant exercised his right to remain silent were voluntary.

**{30}** At trial, Defendant requested that the district court determine whether his suppressed statements could be used by the State to impeach him if he testified at trial. Defendant objected to the use of the suppressed statements for impeachment purposes on the basis that they were involuntary. The district court found that the statements were voluntary and allowed the State to use them to impeach Defendant's testimony. The district court instructed the jury that the statements were to be used for the limited purpose of impeaching the witness's testimony at trial.

---

[2]*State v. Gabaldon*, 1978-NMCA-101, ¶¶ 25, 28, 92 N.M. 230, 585 P.2d 1352, *abrogation recognized on other grounds by State v. Branch*, 2016-NMCA-071, ¶¶ 36-37, 387 P.3d 250, *cert. granted*, 2016-NMCERT-___ (No. S-1-SC-35951, July 28, 2016); *see also State v. Charlton*, 1992-NMCA-124, ¶ 26, 115 N.M. 35, 846 P.2d 341, *abrogation recognized on other grounds by State v. Branch*, 2016-NMCA-071, ¶¶ 36-37, 387 P.3d 250, *cert. granted*, 2016-NMCERT-___ (No. S-1-SC-35951, July 28, 2016).

**{31}** On appeal, Defendant argues that the persistent questioning and alleged promises of leniency render his statements involuntary and inadmissible at trial for any purpose, including impeachment.

**{32}** In *Miranda v. Arizona*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Those procedural safeguards include warning a suspect of certain rights, and also require that "if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Id*. at 445.

**{33}** Five years later, in *Harris v. New York*, the United States Supreme Court clarified that while statements obtained in violation of *Miranda* would be inadmissible in the prosecution's case in chief, such statements could still be used to impeach a defendant's testimony at trial if their "trustworthiness . . . satisfie[d] legal standards." 401 U.S. 222, 224 (1971). "[T]o meet the standard of trustworthiness, the statements must have been given voluntarily." *State v. Omar-Muhammad*, 1987-NMSC-043, ¶ 26, 105 N.M. 788, 737 P.2d 1165.

**{34}** We review the voluntariness of confessions de novo. *State v. Evans*, 2009-NMSC-027, ¶ 32, 146 N.M. 319, 210 P.3d 216. "Voluntariness means freedom from official coercion." *State v. Sanders*, 2000-NMSC-032, ¶ 6, 129 N.M. 728, 13 P.3d 460 (internal quotation marks and citations omitted). Promises of leniency on the part of police can be coercive and may render a subsequent statement involuntary. *See Evans*, 2009-NMSC-027, ¶ 42 (noting that threats and promises by the police may rise to the level of coercion).

**{35}** Express promises of leniency "render[] a confession involuntary as a matter of law." *State v. Tindle*, 1986-NMCA-035, ¶ 25, 104 N.M. 195, 718 P.2d 705. "However, unlike an express promise of leniency, which can render a confession inadmissible as a matter of law, evidence of an *implied* promise is only [one] factor in the totality of the circumstances that courts consider in determining whether a confession is voluntary." *State v. Gutierrez*, 2011-NMSC-024, ¶ 25, 150 N.M. 232, 258 P.3d 1024 (emphasis added). Where the evidence does not clearly establish a promise of leniency, the question becomes one of an indirect or implied promise.

**{36}** In this case, we consider "whether the accused could reasonably have inferred a promise going to the punishment for the crime to be confessed." *State v. Munoz*, 1998-NMSC-048, ¶ 34, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted). The determination of the voluntariness of a statement "requires careful evaluation of all the circumstances of the interrogation." *Mincey v. Arizona*, 437 U.S. 385, 401 (1978); *see also Munoz*, 1998-NMSC-048, ¶ 24 ("Voluntariness is determined by the totality of the circumstances, not by a number of independent tests of voluntariness."). Importantly,

9

"threats that merely highlight potential real consequences, or are 'adjurations to tell the truth,' are not characterized as impermissibly coercive." *Evans*, 2009-NMSC-027, ¶ 43 (citation omitted).

**{37}** "On a claim that police coerced a statement, the prosecution bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary." *Id.* ¶ 34. "[W]e review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a defendant's confession was voluntary." *State v. Fekete*, 1995-NMSC-049, ¶ 34, 120 N.M. 290, 901 P.2d 708. "[T]he preponderance of the evidence must establish that the confession was not 'extracted from an accused through fear, coercion, hope of reward[,] or other improper inducements.'" *State v. Cooper*, 1997-NMSC-058, ¶ 30, 124 N.M. 277, 949 P.2d 660 (quoting *State v. Turnbow*, 1960-NMSC-081, ¶ 41, 67 N.M. 241, 354 P.2d 533).

**{38}** The district court found that Defendant clearly invoked his right to remain silent and repeatedly made clear that he did not want to speak with the detectives. The district court also found that the detectives continued to question Defendant; at times he did not respond, although at other times he provided factual responses.

**{39}** Defendant expressed his concern to the detectives that "no matter what I'm going to jail. It's over for me. . . . It's over for me no matter what." In response, one of the detectives told Defendant that the:

> investigation is not just gonna disappear. . . . [I]f [we] don't get your side of the story, . . . it's gonna continue on and it's gonna go forward and we're going to do what we have to do. But if [we] get your side of the story the end result could be different. The end result could be a lot different.

After more discussion, the detective told Defendant:

> I'm not the judge. I'm not the prosecutor. But I do know that we work hand in hand; okay, the courts, the judges, the prosecutors, us, we all work hand in hand and 95 percent of the time we're sitting there at the table when it goes to court. . . . And, like I said, David, about my report and my relationship with the judge and the prosecutor and everyone else, it will speak volumes for you; okay?

**{40}** When Defendant asked the detectives if they were "gonna help me out," one detective responded, "what I can do is I'll do my investigation and when I do my report, my report is gonna reflect . . . what they call your demeanor, how you're acting, how you portray yourself[,] . . . and the truthfulness that you come forward with." One of the detectives informed Defendant that he would report that Defendant lied, but was remorseful.

**{41}** Later in the interview, one of the detectives stated, "we need to give this young man

10

as much help as we can, get him into the programs . . . . [W]e need to get you into drug rehab, anger management for sure . . . . [W]e need to get [a] psychological evaluation; we need to get this young man some [help.]" Defendant told the detectives, "I just don't want to be locked up." One detective replied, "I understand that. But, you know, there's some things I can't stop[.]"

{42} Our review of these statements supports the district court's finding that the detectives made implied promises of leniency to Defendant throughout the interview in exchange for his cooperation, but we conclude that under the totality of the circumstances, the statements were voluntary. The detectives' statements were not express promises because they did not provide an unequivocal guarantee that Defendant would receive leniency if he gave a statement. And contrary to the State's assertion, the detectives' statements were not mere suggestions that Defendant could help himself by being cooperative. Rather, the detectives implied that they would act on Defendant's behalf and help get his charges reduced.

{43} The detectives' statements to Defendant gave rise to the understanding that, if he made a statement, the detectives had the ability to influence the individuals who would make the decision on a possible reduction in charges. Though courts have found acceptable mere offers to bring a defendant's cooperation to the attention of the district attorney, *see Sanders*, 2000-NMSC-032, ¶ 10 (stating that "merely promising to bring a defendant's cooperation to the attention of the prosecutor is not objectionable"), the detectives made more than a mere offer by stating, "the courts, the judges, the prosecutors, [and the detectives] all work hand in hand[,] and 95 percent of the time . . . sit[] . . . at the table when it goes to court." These statements constituted a promise of leniency because they implied that, if Defendant confessed, the detectives were not only willing—based on their supposed desire to help Defendant—but also able to help, due to their "relationship" with the court, the judge, and the prosecutor. *See Munoz*, 1998-NMSC-048, ¶ 34; *cf. State v. Lobato*, 2006-NMCA-051, ¶ 18, 139 N.M. 431, 134 P.3d 122 (concluding that there is no implied promise of leniency where the officer told the defendant he would get treatment if he confessed, but did not tell the defendant he would receive treatment instead of prison time).

{44} We have noted, "[w]here the suggestion is that 'it will be better,' or that 'it will be to your best interests' to tell the truth, . . . the accused may have inferred some promise going to the punishment for the crime[.]" *State v. Wickman*, 1935-NMSC-035, ¶ 31, 39 N.M. 198, 43 P.2d 933. The detectives made statements to that effect. Based on these statements, Defendant could have inferred that the detectives were making a promise of leniency. *See Munoz*, 1998-NMSC-048, ¶ 34.

{45} However, an implied promise does not by itself render Defendant's statements involuntary. Rather, it is but one factor in the voluntariness analysis. We next consider the other factors of voluntariness in this case to determine if Defendant's statements were involuntary. *See Gutierrez*, 2011-NMSC-024, ¶ 25 (stating that "evidence of an implied promise is only a factor in the totality of the circumstances that courts consider in determining whether a confession is voluntary").

11

**{46}** The State correctly distinguishes Defendant's case from a case involving a similar issue with more extreme facts. *Mincey*, 437 U.S. at 398-401. In *Mincey*, the interrogating officers persisted in questioning a defendant who was injured, hospitalized, in pain, and coming in and out of consciousness. *Id.* In that case, the United States Supreme Court held that "Mincey's statements were *not* the product of his free and rational choice. To the contrary, the undisputed evidence makes clear that Mincey wanted not to answer[.]" *Id.* at 401 (emphasis in original) (internal quotation marks and citation omitted). Unlike the defendant in *Mincey*, Defendant appeared to be in good health and was not suffering, aside from his complaints about being tired. Therefore, the conduct of the detectives cannot accurately be characterized as overcoming Defendant's free will.

**{47}** While Defendant repeatedly expressed his desire to end the conversation, speak to an attorney, and stated that he was too tired to talk, the detectives were not otherwise abusive or threatening so as to render their conduct coercive. Further, the detectives qualified the implied promises with clear statements to the effect that they could not prevent Defendant from getting "locked up."

**{48}** While the detectives' implied promises of leniency and the Defendant's sleepiness weigh in favor of an involuntary confession, we agree with the district court that based on the totality of the circumstances they were insufficient to render Defendant's will overborne. *See State v. Barr*, 2009-NMSC-024, ¶ 24, 146 N.M. 301, 210 P.3d 198 (stating that "[a] confession is coerced when the [d]efendant's will [is] overborne and his capacity for self-determination [is] critically impaired" (internal quotation marks and citation omitted)), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37, 275 P.3d 110. We conclude that any implied promises did not overwhelm Defendant's will or impair his capacity for self-determination such that his statements were involuntary.

**{49}** We therefore affirm the district court's order that the State met its burden of showing by a preponderance of the evidence that Defendant's statements were voluntary, and the statements were admissible for impeachment purposes.

## IV.    CONCLUSION

**{50}** We vacate Defendant's conviction of felony murder and order that a conviction of second-degree murder be entered instead. We reject Defendant's remaining claims of error and affirm the district court with respect to Defendant's remaining claims.

**{51}    IT IS SO ORDERED.**

_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**


_____

**CHARLES W. DANIELS, Justice**

**JUDITH K. NAKAMURA, Chief Justice, specially concurring**

**NAKAMURA, J. (specially concurring).**

**{52}**    The majority concludes that Defendant's felony-murder conviction must be vacated because "shooting at or from a motor vehicle cannot serve as the predicate to felony murder . . . ." *Maj. Op.* ¶ 6 (citing *Marquez*, 2016-NMSC-025). I accept that the majority is applying the law as stated in *Marquez*. Yet I continue to believe that the predicate felony issue in *Marquez* should have been decided differently and that shooting at or from a motor vehicle *may* serve as a predicate felony for felony murder. The reasoning underlying this conclusion is set out in my dissenting opinion in *Marquez* and need not be restated here. 2016-NMSC-025, ¶¶ 62-81. I note only that the majority in the present case illuminates additional support for my dissenting opinion in *Marquez*.

**{53}**    According to the majority, the fact that Defendant shot at Victim from a motor vehicle is significant. The motor vehicle provided Defendant protection from a counterattack and served as the means for escape. *Maj. Op.* ¶ 18. I agree with this assessment and the conclusion that flows inevitably from it: When a defendant uses a vehicle to perpetrate a shooting, that act is different in kind and degree from a shooting perpetrated by a defendant who is stationary or walking rather than traveling by car or using other transport. Accordingly, we may infer that our Legislature did not intend to prohibit shooting at or from a motor vehicle from being used as a predicate offense for felony murder but intended to authorize separate application of each criminal statute. *See Marquez*, 2016-NMSC-025, ¶ 19 ("Our case law requires us to 'look, not to the nature of the act, but rather to whether the legislature intended that a particular felony should be able to serve as a predicate to felony murder.' " (emphasis omitted) (quoting *Campos v. Bravo*, 2007-NMSC-021, ¶ 14, 141 N.M. 801, 161 P.3d 846)).

**{54}**    I agree with the majority's conclusion that the evidence was sufficient to support second-degree murder, even though this conclusion operates from the premise that Defendant's felony-murder conviction cannot stand. I concur with the remaining sections of the majority's opinion and the conclusions there reached.


_____

**JUDITH K. NAKAMURA, Chief Justice**